395 A.2d 1319

In the Matter of Livingstone M. JOHNSON, Judge of the
Court of Common Pleas of Allegheny
County, Pennsylvania.

Supreme Court of Pennsylvania.

Dec. 26, 1978.

Justin M. Johnson, Pittsburgh, for appellant.

John J. Kennedy, Jr., Pittsburgh, for appellee.

Before EAGEN, C. J., and ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

PER CURIAM:

The Judicial Inquiry and Review Board (Board) has submitted two reports to this Court recommending, in each case, that respondent, Livingstone M. Johnson, Judge of the Court of Common Pleas of Allegheny County, be reprimanded. We are required under Article 5, Section 18(h) of the Pennsylvania Constitution to "review the record of the board's proceedings on the law and facts" and enter an order that is "just and proper." This Court may dismiss the charges or impose a discipline more severe than that recommended. After a thorough review of the facts and the law, we conclude that the proceedings instituted against the respondent should be dismissed.

The Board's first report covers proceedings instituted against respondent stemming from an incident which occurred on January 21, 1975, during the trial of *Common-*

*wealth v. Richard Mayberry.* Late in the morning session of one of the last days of that trial, which had been in progress for several weeks, the prosecution called as a witness, Robert X. Medonis, an attorney who was under subpoena and subject to a court order that all subpoenaed witnesses be available on fifteen-minute notice when called to testify. After a delay of approximately one-half hour, respondent recessed the court for the luncheon break and ordered that the witness be held in custody, when he appeared, until after the lunch break in order to insure his appearance as a witness when court resumed for the afternoon session. Pursuant to the court's order the witness, who appeared in the hall outside the courtroom after the recess had been declared, was taken into custody by deputy sheriffs and was placed in an area on a different floor of the court house. This area, was the waiting room portion of the bull pen, a security room where persons are held whose appearances will be required during trials. The bull pen has one section secured by bars and another section referred to as the waiting area. The witness remained in the waiting area in the custody of a deputy sheriff until he was taken to the courtroom to testify during the afternoon session of the Mayberry trial.

The Board concluded "[that the witness's] conduct did not warrant his being held in custody, [and that] respondent's conduct was without proper basis and was flagrantly injudicious." The Board then recommended (with two members dissenting) that respondent "be reprimanded by the Supreme Court for violation of the Code of Judicial Conduct," although in its conclusions the Board did not refer as it should have to any particular portion of the Code which it concluded had been violated. Nevertheless, we have been able to ascertain from the proceedings instituted against respondent that the sections of the Canons involved are Canons 2(A) and 3(A)(3). The Board's two dissenting members concluded that respondent "diligently [attempted] to conduct a trial in a dignified, expeditious manner" and did not violate the Code of Judicial Conduct. These two mem-

bers were of the opinion that this charge should be dismissed.

The Board's second report resulted from an incident which occurred while respondent was presiding over court proceedings on June 7, 1976. That incident took place during a hearing for three juveniles accused of purse snatching. The June 7, 1976 hearing was the second held concerning these juveniles. The first had been held several weeks earlier. Following the first hearing, a newspaper article appeared and purported to quote certain unidentified police detectives regarding what had transpired at the first hearing. The article included the names of the juveniles involved. From the information contained in the article there is no doubt that someone had violated the law requiring confidentiality in juvenile proceedings.

At the commencement of the second hearing respondent called the three police detectives who had been present at the first hearing to the front of the court room. Respondent read the newspaper article, and questioned the three detectives about their involvement with the illegal breach of confidentiality which had resulted in the article. Respondent also read a letter which he had received from another detective, and his reply to that letter, both of which concerned laws regarding juveniles. Respondent then warned the detectives that the breach of confidentiality was in violation of the Juvenile Act. He then said, "to the extent that any of the three or all three of you participated in that, you are violative of this Act and you are placing yourselves in contempt of court." Respondent then made some additional comments regarding the first hearing, and indicated that he was about to begin with the proceedings concerning the accusation of purse snatching against the juveniles. At that point respondent asked the detectives if they had enough witnesses with them to testify. The following colloquy then occurred:

"DET. FORBES: Do we get to answer any of this, Judge?
THE COURT: Certainly you get to answer it.
DET. FORBES: Whenever I get to answer it you let me know.

THE COURT: Certainly you get the chance to answer it, because this is the last chance you will get to act in contempt of this Court without being formally charged. You have a right to show why you shouldn't be held in contempt, brought before this Court, and then given your Constitutional rights and a full hearing, and fair disposition thereafter.

DET. FORBES: Well, if you feel I am entitled to just what you are talking about, Judge, then I would suggest you go ahead and do that.

THE COURT: That's my opinion. That's what you suggest?

DET. FORBES: If you are implying—

THE COURT: I am not implying anything. I am giving you a warning, and if you are smart you will take it.

DET. FORBES: If you are implying I wrote that statement and had something to do with that statement—

THE COURT: If you are smart, you will take it. Now, you keep talking, I will hold you in contempt for your conduct here.

DET. FORBES: I take it you won't let me talk, Judge, so I guess I can't talk.

THE COURT: I will tell you, when you talk to this Court you will talk with decorum or you will be adjudicated in contempt.

DET. FORBES: I will talk with decorum, Judge—

THE COURT: Or you will be adjudicated in contempt.

DET. FORBES: Then you are going to have to find me in contempt, Judge.

THE COURT: On that policy you will stand and apologize to the Court or you will be found in contempt on that statement.

DET. FORBES: I will stand, Judge. I won't apologize to the Court.

THE COURT: You will stand and you will apologize to the Court for your contempt.

DET. FORBES: I will stand and I will tell you I am not apologizing to this Court.

THE COURT: Take him and put him in lock-up. Take him and put him in lock-up. And when he is ready to apologize, bring him back here for the apology."

Detective Forbes was then held in custody for a short time on a charge of criminal contempt. He was released pursuant to a stay order issued by a Superior Court judge.

In its report the Board said the following regarding this incident:

"Respondent was concerned about the breach of confidentiality in the newspaper article. However, his conduct went far beyond the normal concern of a Court for violations of confidentiality in harming the juveniles involved. He obviously did not believe the police officers who testified under oath that they had no involvement with the news article and threatened them with contempt for a breach of confidentiality. His manner of inquisition held the police officers up to ridicule before the juvenile defendants and their families. He displayed unseemly anger, prejudice, a lack of care in protecting and affording the exercise of the rights of the police officers, and an arbitrariness of conduct and lack of restraint which resulted in the holding of a police detective in custody on a charge of contempt.

Respondent conducted the aforesaid proceeding in an unusually loud tone of voice and in a belligerent and antagonistic manner.

. . . . .

The Respondent held three police officer witnesses up to ridicule in a court proceeding, found them guilty of causing or participating in a news release containing information proscribed by the Juvenile Court Act, although the evidence before him provided no basis for such a finding, refused or neglected to give the police officer witnesses opportunity to obtain counsel and opportunity to be heard in their own behalf, and then found one police officer witness guilty of criminal contempt without reason in fact or in law.

A judge has a duty to investigate improprieties with respect to the reporting of juvenile court proceedings. However, Respondent erred in his manner and timing regarding the alleged violations by making the accusations in open court, during a legal proceeding and in the very presence of parties and witnesses concerned with the case out of which the controversy arose. If it was Respondent's intention merely to discuss the matter or to warn the detectives, he should have done so in chambers or in another appropriate private setting. On the other hand, if sanction of any kind was contemplated, he owed a duty to give reasonable notice to the individuals involved and to their superiors, with some specification of facts supporting the alleged misconduct, and a fair opportunity to be heard.

Respondent's conduct is in violation of Canons 2A and 3A(3) of the Code of Judicial Conduct."

The Board recommended that respondent be reprimanded in conjunction with the reprimand recommended in the earlier proceedings concerning the subpoenaed witness. Two members of the Board also dissented from this recommendation.

The Canons involved in the two matters before us are Canons 2A and 3A(3). They provide:

## CANON 2

### A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

## CANON 3

### A Judge Should Perform the Duties of His Office Impartially and Diligently

The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the

duties of his office prescribed by law. In the performance of these duties, the following standards apply:

A. Adjudicative Responsibilities

(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control.

After reviewing the facts in the record we cannot agree with the Board that respondent should be reprimanded for violation of the above Canons.

█ With respect to the first matter before the Board, when respondent ordered a witness held in custody until the afternoon session commenced, we do not agree that the record sustains the Board's conclusion that respondent's conduct was "flagrantly injudicious." The Board has pointed out that the witness who was not present when he was called to testify "took every reasonable precaution to be in compliance with the subpoena and his obligation to be available in court within a fifteen-minute period. His absence was due to his occupation with court business [in another courtroom] and he exerted every effort to return to court as quickly as possible." We agree with the Board that the subpoenaed attorney committed no serious error, even though he was not present within fifteen minutes of being called. He believed he would not be called until the afternoon recess, and he notified the prosecution and other court personnel that he would be across the street in a courtroom in another building if needed. This type of arrangement is not unusual or extraordinary and is frequently a necessity in scheduling and conducting court business requiring the presence of attorneys.

The matter before us, however, is not one in which we are concerned with the conduct of the subpoenaed attorney. We are concerned with the conduct of respondent and, therefore, we must consider precisely the circumstances known to respondent at the time he acted. This Court cannot base a reprimand on either facts or perspectives gained later. Re-

spondent was presiding over the trial of one Richard Mayberry, when he ordered the witness held in custody. Richard Mayberry had been involvèd in a prior criminal trial in Allegheny County during which he allegedly engaged in disruptive conduct. This prior trial was able to proceed only after he had been gagged, straitjacketed, and removed to an adjoining courtroom into which the remainder of the trial was broadcast. For his conduct Mayberry was held in summary contempt of court. The conviction was reversed by the United States Supreme Court, however, and a trial ordered. *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971). It was that trial over which respondent was presiding. Because of this alleged disruptive conduct by Mayberry, special time consuming security measures were taken each time Mayberry was brought to and from respondent's courtroom. Although Mayberry's conduct during the proceedings before respondent was not disruptive, as the prior alleged conduct had been, nonetheless there was concern that it might be. This concern created an atmosphere of tension in the courtroom.

On the day before the incident which is the subject of the Board's proceeding, the witness had visited respondent and informed respondent that he was afraid his presence in the courtroom as a witness would incite Mayberry. He said that Mayberry had threatened him at the conclusion of Mayberry's prior trial, and he had received information at the last trial that there might be an attempt to stab him with a pen. He asked respondent to prohibit Mayberry, who was conducting his own defense, from walking around while questioning witnesses.

The next morning, without mentioning the prior day's conversation with the witness, respondent ordered both counsel for the prosecution and the defendant to remain seated while questioning witnesses. In his testimony before the Board, respondent explained that, because of the conversation he had had with the subpoenaed witness the day before, he was concerned that the witness might not appear to testify when called. Immediately following the witness's

failure to respond to the call, respondent was told by the prosecuting attorney, who had requested the subpoenaing of the witness, that the witness was in a courtroom in a building across the street. Respondent had not been told of this potential scheduling conflict even though the witness knew of it during his conversation with respondent the previous day. Respondent, along with the jury and other participants in the trial then waited, while the prosecuting attorney at respondent's request telephoned to obtain information about the witness's availability. Upon his return to the courtroom, the prosecuting attorney told respondent that the subpoenaed attorney was tied up in another courtroom, and indicated that the witness would soon return. Respondent then asked the prosecuting attorney if he could assure the witness's presence for the afternoon session. The prosecuting attorney said he could not. It was then that respondent ordered the deputy sheriffs to hold the witness in custody until the afternoon session if he appeared.

We do not believe that respondent's conduct can be called flagrantly injudicious. The trial being conducted involved a defendant for whom extra security precautions had been taken. Respondent was aware of the witness's concern for his own safety and, the prosecuting attorney could give no assurance that the witness would be present at the afternoon session. Respondent's action was taken to guarantee a continuation of the trial that day and to prevent any further delay or interruption because of an unavailable subpoenaed witness.

The subpoenaed witness appeared out in the hall but never entered the courtroom to offer any explanation to respondent. There was some evidence that respondent knew this fact before leaving the courtroom. The recess had already been declared, and respondent was about to leave for the luncheon recess. Surely at that point respondent had no duty to walk out in the hall looking for the subpoenaed witness even if he had, by hearsay, learned that the witness was there. The prosecuting attorney, who was still present on the scene, and who had talked with the witness, made no attempt to assure respondent that the witness

would be present after the recess. Surely it was not incumbent upon respondent, having issued the order, and having declared a recess, to take the initiative when neither the subpoenaed witness nor the prosecuting attorney approached respondent with an explanation and an assurance that the witness would be present later.

It may be that some other judge might have handled the matter differently. Another judge may have sought out the witness in the halls to straighten the matter out. That is all beside the point, however. Considering all of the circumstances, the respondent's order cannot be considered flagrantly injudicious.

In the matter involving the contempt order issued against the detective, we likewise do not agree with the Board that a reprimand should be imposed. In doing so we note that the issue before us is not whether the issuance of the order was legal error, but whether the issuance of the order took place under circumstances indicating a violation of the Canons.

The Board's conclusions fall essentially into three categories: (1) that respondent did not give the detectives an opportunity to be heard, displaying a lack of care in affording them an opportunity to exercise their rights; (2) that respondent's warning should have been in chambers or other appropriate private setting; and (3) that respondent acted in anger, belligerently and antagonistically speaking in an unusually loud tone of voice, and displaying a lack of restraint.

As to the first group of allegations the Board's report states that respondent found the three detectives "guilty of causing or participating in a news release containing information proscribed by the Juvenile Court Act." This statement is inaccurate. Respondent did not say that the detectives were the guilty parties, and it is clear from the record that, although he had strong suspicions, he was only issuing a warning "*if* they were the guilty parties." There is nothing in the record to indicate that respondent was conducting a hearing which was to culminate in a finding of guilt. He had a newspaper article before him indicating a violation of the law and quoting unidentified detectives.

Respondent's suspicion that these men may have been responsible for the leak was not unreasonable. It is obvious from the transcript, however, that respondent had brought his warning to an end without any intention of further action or to impose any consequences for his suspicions. We are not certain what rights with which the Board was concerned since only a warning—with no imposition of punishment—was involved. Nonetheless, we note that at one point during the warning, one of the detectives said that he thought he should have an attorney present before answering questions. The following then took place:

"THE COURT: That will be fine with the Court, if you desire the services of a solicitor.

DET. JAMES: Yes, because I am getting involved in something here that is pretty controversial.

THE COURT: It is not a bit controversial with me, it is law with me, Detective James. If you want a lawyer, we will wait for you to get your lawyer. If you want to answer the Court's question, we will hear your response.

DET. JAMES: Well, I feel that we should have some representation here. We are sitting here like—

THE COURT: You are sitting here like three people.

DET. JAMES: —three people, right.

THE COURT: Who are sworn to uphold the law as officers.

DET. JAMES: Well, yes."

From the above, it is quite clear that when one of the detectives indicated his desire to have an attorney present respondent agreed that the detective had that right and no further questions were addressed to that detective.

■ The Board's second conclusion that any warning should have been conducted in private, outside the hearing of the other persons present in the room who were involved in the juvenile proceedings, may indicate the course of conduct that might have been more appropriate. Again, a hindsight analysis may indicate that a different course of conduct would have been a better way to warn the detectives. Warnings in open court from judges to witnesses,

litigants, and counsel most often take place in front of other persons. Indeed, on many occasions the public transcripts of trials will show that warnings are regularly given to lawyers even in criminal cases, sometimes in the presence of juries when, unlike the present situation, such warnings might seriously affect the rights of the person on trial.

Respondent was quite properly concerned about a breach of confidentiality that arose out of an earlier proceeding before him. Another judge may have handled the matter privately in chambers. Respondent's decision to do so in a private hearing not open to the public or the press and in the presence of a limited number of persons does not warrant the imposition of a reprimand.

The evidence concerning respondent's manner during the above proceedings was sharply in conflict. Although some witnesses described respondent's conduct as angry, antagonistic, and belligerent, other witnesses completely disagreed. These witnesses testified that respondent, although speaking in a loud voice, was speaking as he normally does in the court room so that he could be heard in all parts of the room. These witnesses said that respondent was not angry, antagonistic, or belligerent. Some of these witnesses testified that it was the detective who was aggressive in manner and speech when he interrupted respondent as the juvenile proceedings were about to begin. The evidence in this regard is not clear and convincing and is insufficient to sustain the imposition of an official reprimand.

We arrive at this conclusion after reading the official transcript of what transpired. There is no indication in respondent's comments that he was acting without restraint. When asked by one detective about his right to counsel respondent properly answered that the detective was entitled to a lawyer and if he so desired would not be questioned without one. No further questioning took place. When the detective held in contempt indicated a desire to answer what respondent had implied by his warning respondent indicated that if formal charges were ever brought against the officers for any future conduct an opportunity to answer would be afforded.

When respondent held the one detective in contempt, it is obvious he was not doing so because of the newspaper article, but because he thought that the detective was not speaking with decorum. He warned the detective who then replied "then you are going to have to find me in contempt, Judge."

At best it is most difficult on this record to conclude that the respondent's manner was clearly of a kind that warrants an official reprimand. No doubt the truth of the matter may well lie in a conclusion that both respondent and the detective were speaking at the crucial moment in loud and aggressive voices. Considering all of the circumstances, however, we reject the Board's conclusion that an official reprimand should be imposed.

In the past, when we have had before us contempt citations which have been reversed, we have indicated the need for judges to be ever vigilant in guarding against the erroneous use of the contempt power. We reiterate these concerns to all judges.

 Reversible error committed by a trial judge who holds a person in contempt, however, does not in and of itself provide a basis for the imposition of discipline. On various prior occasions we have held that a trial judge acted erroneously in holding individuals in contempt. In doing so we have quoted with approval from *Craig v. Harney*, 331 U.S. 367, 396, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546, 1562 (1947) that "the law of contempt is not made for the protection of judges who may be sensitive . . .. Judges are supposed to be [persons] of fortitude, able to thrive in a hardy climate." Although we have indicated our displeasure with the injudicious use of the contempt authority, we have not officially reprimanded or censured a judge whose contempt order has been reversed. The authority of a judge to hold one in contempt, depriving as it does a person of liberty, is an authority that should be used rarely, and with extreme caution. Nevertheless, judges overly sensitive, or judges acting in pressure-laden situations, should not be required to fear automatic discipline because a contempt ruling might

later be reversed on appeal. Judges have and will make mistakes. They are human beings and not robots woven from steel mesh.

For these reasons, we do not consider the conduct of respondent in the two matters before us as falling into an area warranting the imposition of an official reprimand. The proceedings in both matters are hereby dismissed.

O'BRIEN, J., did not participate in the consideration or decision of this case.

ROBERTS and LARSEN, JJ., filed dissenting opinions.

POMEROY, former J., did not participate in the decision of this case.

## DISSENTING STATEMENT

Mr. Justice ROBERTS dissents and would accept the recommendation of The Judicial Inquiry and Review Board, dated March 22, 1978. (See Report of the Judicial Inquiry and Review Board, filed August 3, 1978 in the Office of the Prothonotary—Eastern District.)

LARSEN, Justice, dissenting.

I dissent. The majority is willing to excuse an ill-tempered, jail-happy judge's behavior even though the Judicial Inquiry and Review Board (judicial disciplinary arm of the Supreme Court) recommended that some sanction be applied. In the two cases before us Judge Johnson decided to throw two people (a policeman and an attorney) in jail because he whimsically and angrily did not like what they did. His actions were to further his own personal emotional needs as opposed to judicial-public servant needs. His behavior is characteristic of a bully. Judge Johnson should be suspended from office for one month during which time all pay and benefits would be forfeited.

It may be that Judge Johnson does not have the desired judicial temperament required of those who serve on the bench. If there is no improvement in Judge Johnson's behavior after this suspension, he should be removed from office permanently.