OPINION OF THE COURT

Per Curiam.

A Judge whose conduct off the Bench demonstrates a blatant lack not only of judgment but also of judicial temperment, and complete disregard of the appearances of impropriety inherent in his conduct, should be removed from office, notwithstanding that his reputation for honesty, integrity and judicial demeanor in the legal community has been excellent. The commission’s findings of fact should be confirmed but its determined sanction of censure should be rejected and the sanction of removal imposed, as hereafter directed.
Petitioner is a Judge of the Civil Court, Kings County. He is also a trustee of the Associated Humane Societies of New Jersey (AHS), a not-for-profit corporation which in 1977 was seeking, a permit to operate an animal shelter in *400 Kings County. In December, 1977, John Esteves, the manager of the AHS shelter, received three summonses, one from the city department of health for operating the Kings County shelter without a permit, and two from the ASPCA for violations relating to health certificates for dogs shipped from New Jersey and to the manner in which certain animals were kept. Other violations were investigated apparently in March or May, 1978, and a further summons issued.
In relation to the permit application, petitioner had several telephone conversations with Dr. Alan Beck, Director of the New York City Department of Health, Bureau of Animal Affairs. In these conversations, petitioner identified himself as a Judge, inquired why the AHS permits had not been granted and on receiving an explanation became angry and screamed so loudly into the telephone that Dr. Beck could not keep the phone to his ear. He also informed Dr. Beck that he had more political clout than Dr. Beck, and in vulgar language told Dr. Beck he should stop impeding the AHS application. The permit came up also in the courtroom corridor conversation, hereafter detailed, between petitioner and Dr. Howard Levin, Chief Veterinarian of the City Department of Health, when petitioner raised the question why it had ndt been issued and suggested that “he had people in high places that he hadn’t even tapped as yet.”
In relation to the summonses, petitioner was called by Esteves at the time the 1978 summons was issued. Esteves then put Dr. Levin, who had just inspected the shelter, on the phone with petitioner. Levin was told by petitioner, in what Levin characterized as a threatening voice, that the department was abusing its authority. Petitioner also contacted Dr. John Kullberg, Executive Director of the ASPCA, and Eric Plasa, its Law Enforcement Director, in an effort to have the 1977 summonses dropped. Dr. Kullberg declined that suggestion but informed petitioner that the society would make an unannounced reinspection and inform the court of its results when the violations came on for trial. Petitioner requested that he be notified in advance of such a reinspection. No reinspection was ever made.
Thereafter, when the Esteves matter came on before Judge Eugene Nardelli in Criminal Court, petitioner sat *401 in the rear of the courtroom, and Judge Nardelli was informed by the AHS attorney, during discussions, that petitioner sat on the AHS board. After the matter had beén adjourned, petitioner approached the Bench and commented to Judge Nardelli that if the ASPCA and the department of health were really interested in animals, they would not be proceeding as they were. In the corridor outside Judge Nardelli’s courtroom there ensued a heated discussion participated in by petitioner, the AHS attorney, Dr. Levin, the ASPCA attorney and two ASPCA officers. All three of the ASPCA personnel testified, as did Dr. Levin, that petitioner was angry, was talking in a loud voice and stated during the conversation both that he was a Judge andldiat he had friends in high places.
The commission determined that it was improper for petitioner to have attempted to persuade ASPCA officials to withdraw the summonses and to identify himself as a Judge while so doing, to interfere with department of health officials on behalf of AHS in relation to issuance of a permit, to have identified himself as a Judge in so doing and to have addressed those officials iíi a-hostile, profane and loud manner, to. have spoken in a loud voice in the public corridor outside the courtroom and referred to his political influence, and to have interfered in the Esteves case by speaking to Judge Nardelli about the case. It concluded that “the blatant impropriety [petitioner] has evinced [is] seriously compounded by his refusal in this record to acknowledge that his actions even appear improper,” but nevertheless determined that the appropriate sanction was censure, which was what the commission administrator, with some misgivings,* had recommended.
Petitioner denied any intent to influence anyone and testified that as a Judge elected ás a reform Democrat in Brooklyn he had no political clout, but never directly denied mak *402 ing the remarks attributed to him. He admitted speaking in emphatic tones, and did not deny the vulgarity attributed to him, saying that he did not remember the exact words and that he could have used another word (a euphemism, which would have conveyed the same meaning). Though he, thus, has not categorically denied the factual basis for the charges, he argues before us, as he did before the commission, that he was not acting as a Judge and gave no appearance of impropriety, that the evidence does not sustain the charges, that the procedures followed were improper and that the Referee improperly ignored the many lawyers and Judges who testified to his reputation for integrity, honesty and judicial demeanor.
As in Matter of Steinberg (51 NY2d 74, 83), so here, we cannot accept petitioner’s “contention that conduct off the Bench may give rise to removal only where there has been some act of overt illegality or extreme ‘moral turpitude’ ”, since “[a]ny conduct, on or off the Bench, inconsistent with proper judicial demeanor subjects the judiciary as a whole to disrespect and impairs the usefulness of the individual Judge to carry out his or her constitutionally mandated function” (Matter of Kuehnel, 49 NY2d 465, 469). Thus, petitioner’s insistence that because he was acting on behalf of a not-for-profit corporation his acts had “nothing to do with my judicial position” is misguided. Equally misguided is the suggestion that general reputation testimony, even though in the numbers and from persons of such standing as testified on petitioner’s behalf, make the findings of the Referee and the commission against the weight of the evidence. As we noted in People v Miller (35 NY2d 65, 69): “Character evidence does not exist in a vacuum, and its value, influence or the weight to be accorded it depends in great part upon the other evidence in the case. * * * If the evidence of guilt against a defendant is cumulative and reliable, the influence of contrary evidence of good character is likely to be slight. Under other circumstances, such evidence may be so good, if believed, as to create a reasonable doubt where without it none would exist.”
After careful review of the record we find the evidence of petitioner’s misconduct, which comes not only from other *403 witnesses but from the subjective nature of his defense and his inability to contravert the objective evidences of that misconduct, to be both cumulative and reliable, and find neither reason to disturb the commission’s findings and conclusions concerning that misconduct nor any basis for holding that there was any infirmity in the procedure followed.
We do, however, reject the commission’s determined sanction. We recognize that the power given us by subdivision 9 of section 44 of the Judiciary Law to do so is not lightly to be exercised and that the ultimate sanction of removal is not normally to be imposed for poor judgment, even extremely poor judgment (Matter of Steinberg, supra, at p 81). The situation with which we deal here is clearly more egregious than that involved in Matter of Lonschein (50 NY2d 569) where the Judge sought special consideration for a license applicant but never asserted his judicial office and did no more than request expedition of the application. Here petitioner, having identified himself as a Judge, nevertheless thought it not improper to request the ASPCA, the complaining and prosecuting agency, to cause dismissal of pending charges. He also asked for preferential treatment for AHS, clearly contrary to the spirit and purpose of the regulatory provisions being enforced, by requesting that he be given advance notice of when reinspection might take place. Likewise, he felt it not improper to address a remark to the Judge before whom the matter was eventually called and which impugned the motives of ASPCA and the department of health in seeking to enforce those regulatory provisions. That it may have been improbable that the same Judge would sit when the matter was again called before the court appears, like petitioner’s suggestion that he lacks political clout, to be an afterthought which may temper but does not excuse the initial transgression.
Also not improper in petitioner’s mind was the threat, made on two separate occasions to Dr. Beck and during the courthouse corridor confrontation, to use political influence to obtain the ends he sought, made in intemperate tones and with the use of vulgarity. That he could be wholly unmindful of the impression that would be made upon others present in that corridor by the spectacle of a person identifying *404 himself as a Judge and speaking in loud and threatening tones of his friends in high places strongly suggests a lack of judicial temperament. Not without significance in that respect is the private admonishment of petitioner by the former State Commission on Judicial Conduct in March, 1977 for having used profane, vulgar and inappropriate language in open court on several occasions in November, 1976.
Compounding those four separate instances of impropriety, as the commission noted, is petitioner’s continued insistence that his actions involved neither impropriety nor the appearance of impropriety. Judicial office, concerned as it is with concepts of reasonable care, arbitrariness, capriciousness, substantiality of evidence, excessiveness of discipline, involves a large measure of discretion. Public acceptance of the judicial product, however exemplary on a substantive level, cannot survive the acceptance of such invective and pressure politics as petitioner’s conduct suggests. As in Matter of Steinberg (51 NY2d 74, 84, supra), we conclude “that petitioner’s complete insensitivity to the special ethical obligations of Judges [renders] him unfit for judicial service”.
For the foregoing reasons we confirm the commission’s findings and conclusions except as to sanction and direct that petitioner be removed from office as a Judge of the Civil Court of the City of New York effective at midnight December 31,1980, and that, during the period between the date of service upon him of a copy of the order to be entered on this decision and December 31, 1980, petitioner be suspended, with pay, from office except to the extent necessary to complete matters begun but not completed by him at the time of such service.

 Immediately following the portion- of the administrator’s'statement quoted in the second paragraph of the dissent-appears the following:
“But where a judge so totally lacks sensitivity to his obligations, his ethical obligations, and where he acts in such a manner to distort the processes of justice, removal was not and is not out of my mind a'question as a recommendation.
“However, there are only two alternatives in my.mind, and I recommend public censure."