314 S.E.2d 391

**In re Herbert L. PAULEY.**

**No. 23–79.**

Supreme Court of Appeals of
West Virginia.

Dec. 15, 1983.

Dissenting Opinion March 9, 1984.

Arthur T. Ciccarello, Lewis, Ciccarello, Masinter & Friedberg, Charleston, for respondent.

McGRAW, Chief Justice:

This judicial disciplinary proceeding arises out of what can best be described as a political imbroglio between Magistrate Herbert L. Pauley and the Kanawha County Sheriff's Department. The record reveals that Magistrate Pauley's troubles first began in 1976, when he was assaulted by a Kanawha County deputy sheriff in the Kanawha County Jail while three other deputy sheriffs passively looked on. As a result of this incident, Pauley filed suit in federal district court against Sheriff G. Kemp Melton and his four deputies, seeking $500,000 in damages.

The relationship between Magistrate Pauley and the Sheriff's Department deteriorated further over the next three years. Pauley and Magistrate Phyllis Gatson of Kanawha County submitted twenty names representing persons who appeared to have been beaten by police to the Federal Bureau of Investigation. Pauley complained that nothing was being done to curb the use of excessive force by police in Kanawha County. Finally, Pauley hinted in 1979 that he might run for Sheriff of Kanawha County in the upcoming election.

Magistrate Pauley's various objections to the conduct of the Sheriff's Department engendered a great deal of animosity which manifested itself in different forms. Pauley complained to an examiner for the Judicial Inquiry Commission that officers resisted implementation of an administrative order by this Court that magistrates, and not police officers, set the amount of fines in traffic cases. In addition, Magistrate Pauley asserted that officers frequently avoided appearing before him by releasing arrested persons outright or by contacting the sheriff's communications center to ascertain which magistrate was on duty. When officers learned that he was on duty, Pauley contended that they would take their prisoners before another magistrate at one of the satellite offices to avoid appearing before him. Finally, Pauley related various attempts at intimidation by several deputy sheriffs, including one incident in which an off-duty deputy sheriff threatened Pauley on a street outside the magistrate court, stating, "I'll beat your God Damn Ass" and "remember, I never lose."

On August 13, 1979, the antipathy between Magistrate Pauley and Sheriff Melton culminated in a complaint being filed with the West Virginia Judicial Inquiry Commission, now the Judicial Investigation Commission, by the sheriff, alleging violations of the Judicial Code of Ethics by Magistrate Pauley arising out of an incident involving one of Melton's deputies, Raymond E. Crabtree. The Judicial Inquiry Commission investigated the charges set forth in the sheriff's complaint, and determined that a reasonable basis existed for the filing of a complaint with the West Virginia Judicial Review Board, now the Judicial Hearing Board, under the West Virginia Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates (1982 & Supp. 1983). This complaint charged Pauley with violations of Canons 2(A),[1] 3(A)(2),[2] and

---

1. Canon 2(A) of the Judicial Code of Ethics provides: "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

2. Canon 3(A)(2) of the Judicial Code of Ethics provides: "A judge should maintain order and decorum in proceedings before him."

3(A)(3) [3] of the West Virginia Judicial Code of Ethics. The specific behavior complained of, as set forth in the complaint, was as follows:

1. On July 10, 1979, Magistrate Pauley, in open court and in the presence of others, talked to Deputy Sheriff R.E. Crabtree in an abusive and humiliating manner.

\* \* \* \* \* \*

2. On July 10, 1979, Magistrate Pauley used profanity in making campaign promises when talking about the Sheriff's Department in a degrading manner.

On May 19, 1983, a hearing in this matter was held before the West Virginia Judicial Hearing Board. At this hearing, testimony was taken from Deputy Sheriff Crabtree, Norma Bennett, Jack Dolin, Yvonne Dolin, Nadine Withrow, and Magistrate Pauley. Upon consideration of this testimony, the Board's findings of fact were as follows:

1. Herbert L. Pauley is a duly elected Magistrate of Kanawha County, West Virginia, and was serving as such Magistrate on July 10, 1979, and on such date was conducting night court at the Kanawha County Courthouse.

2. On such date, Raymond E. Crabtree, a Kanawha County Deputy Sheriff, was serving as bailiff to Magistrate Pauley.

3. During the night court session a bondsperson, Yvonne Dolin, appeared to post a bond for a defendant, James Trent, who was incarcerated in the Kanawha County Jail. At such time, among others in the courtroom, were Norma Bennett, Yvonne Dolin, Jack Dolin, Deputy Sheriff Crabtree and Nadine Withrow, Secretary to Magistrate Pauley.

4. Magistrate Pauley prepared a release for James Trent and gave it to the bailiff and directed him to go to the Jail and obtain the release of said James Trent and to bring him before the Magistrate.

5. The bailiff was informed by jail personnel that authorities in Raleigh County had placed a "hold" on the said James

Trent to answer charges pending in Raleigh County.

6. When the bailiff returned to the courtroom and reported this situation to Magistrate Pauley, the Magistrate, in open court, in the presence and hearing of the persons indicated above, spoke to the bailiff in a loud, abusive and insulting manner, and used profanity in open court in the hearing of the other participants in the proceedings and those assembled in the courtroom.

7. The statements made by Magistrate Pauley attacked the competency of the bailiff and he said on more than one occasion, words to the effect that "When I am elected Sheriff, this shit will stop."

Based upon these findings of fact, the Board held that, "By the use of loud, abusive and insulting language, employing the use of profanity toward one of his court officials, Magistrate Pauley has failed to conform his conduct to Judicial Code of Ethics Canon 3A(2) which requires the judge to maintain order and decorum in proceedings before him." Additionally, the Board held that, "By the use of the same language and demeanor, the Magistrate has failed to conform his conduct to Judicial Code of Ethics Canon 3A(3) which requires the judge to be patient, dignified and courteous to other individuals with whom he deals in his official capacity." The Board recommended that Pauley "be publicly censured, not for his dissatisfaction with the performance of the bailiff, but instead with the manner in which he chose to express that dissatisfaction."

█ In Syllabus Point 1 of *West Virginia Judicial Inquiry Commission v. Dostert,* 165 W.Va. 233, 271 S.E.2d 427 (1980), we defined our role in judicial disciplinary proceedings as follows: "The Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings." We therefore review the Board's findings of fact, as well

---

**3.** Canon 3(A)(3) of the Judicial Code of Ethics provides: "A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control."

as its conclusions of law based upon those findings.

The testimony given before the Board was evenly divided at best and ambiguous at worst. There are a number of important contractions in the testimony of those present at the time the incident at issue took place. Some of this conflict is undoubtedly attributable to the four year lapse between the date of the incident and the date of the hearing before the Judicial Hearing Board. All of the witnesses, except Magistrate Pauley, made reference to the length of time which had elapsed in encountering difficulty in recalling specific details.

Three aspects of the misconduct, upon which the testimony was particularly conflicting, go to the heart of the charges against Pauley. First, the witnesses were equally divided on whether Pauley actually used the word characterized as profane. Three witnesses, Deputy Sheriff Crabtree, Norma Bennett, and Jack Dolin, each testified that Magistrate Pauley used the word. On the other hand, Yvonne Dolin, Nadine Withrow, and Magistrate Pauley testified that it was not used. Second, the three witnesses who did testify that the word was used did not agree on how many times it was used. Crabtree testified that he "believe[d]" Pauley used the word more than once, although he could not remember approximately how many times it was used. Norma Bennett, who accompanied Yvonne Dolin, and her husband, Jack Dolin, to magistrate court that night, testified that Magistrate Pauley made the statement "[a]t least eight or ten times," although she specifically stated that Pauley was not addressing this remark to Crabtree. Jack Dolin, on the other hand, testified only that he heard Pauley use the expression "more than once." Additionally, in its answers to interrogatories propounded by Magistrate Pauley, the Judicial Inquiry Commission alleged that Pauley made the statement "25 times." Finally, each witness also had a different perspective on the severity of Pauley's treatment of his bailiff. Deputy Sheriff Crabtree testified that Pauley "blew up" and "went into a rage," calling him "ignorant" and telling Crabtree that "I am to do what he tells me to do." Norma Bennett testified that Pauley "seemed to be agitated and upset;" that "he was very abusive to this deputy;" and that "he ... made some very cutting remarks." Yvonne Dolin simply characterized Pauley's treatment of Crabtree as "rude." Jack Dolin testified that Pauley "lit in on [Crabtree]" and that "Crabtree was just standing there, looked like a big toadfrog about ready to blow up." Nadine Withrow, Magistrate Pauley's secretary, testified that she did not hear Pauley either raise his voice to Crabtree or abuse him verbally, stating, "I've never heard Mr. Pauley talk like that on the stand." Pauley testified that he may have told Crabtree over the phone "to obey the rules of the court because I was the duty magistrate and this man was entitled to bond to be posted ... and it was his duty ... to bring the prisoner to the court," but Pauley denied abusing Crabtree in any way.

■ Beyond this substantial conflict in testimony concerning the incident, the word characterized by the Judicial Hearing Board as "profanity" is, by dictionary definition, not "profane," but usually considered "vulgar" or "slang." *See* Webster's New Collegiate Dictionary 1063 (1979) ("usu. considered vulgar"); Webster's Third New International Dictionary 2098 ("slang"). In the context of the statement in question, the vulgar slang word characterized as profane by the Judicial Hearing Board means "nonsense" or "foolishness." *See* Webster's New Collegiate Dictionary 1063; Webster's Third New International Dictionary 2098. Based upon what the dictionaries teach us, while it is possible for a vulgar or slang expression to be profane, in the absence of a blasphemous quality, vulgar or slang expressions are not profane. The mischaracterization of the word in question undermines the conclusions of fact and law with which we are presented, as well as the ultimate recommendation of discipline.

The conclusion that Pauley violated Canons 3(A)(2) and 3(A)(3) of the Judicial Code of Ethics was based on his alleged "use of loud, abusive and insulting language, em-

ploying the use of profanity toward one of his court officials ...." Having dealt with the mischaracterization of the language used as "profanity," it is necessary to address the remaining allegations of misconduct contained in the Board's conclusions of law.

The characterization of Pauley's speech as "loud" is conclusory. We notice initially that loudness of speech is in the ear of the hearer. What some may interpret as "loud," others may find "forceful," "assertive," or "resolute." "Loud" as a characterization upon which to base a conclusion of abusiveness is overly broad. *See Matter of Johnson*, 483 Pa. 227, 241, 395 A.2d 1319, 1326 (1978) (refusing to officially reprimand a judge for speaking in a "loud and aggressive voice[ ]"). Furthermore, no testimony was given which supports the characterization of Pauley's tone as "loud," or which indicated that Pauley "yelled," "screamed," "shouted," or "roared" at Deputy Sheriff Crabtree. One witness testified to the volume of Magistrate Pauley's speech. Jack Dolin, who said he had a hearing problem, testified that Pauley's speech was "[m]ore than a normal talking ...."

The Board also characterized Pauley's language as "abusive and insulting." The only abusiveness indicated in the record results from the assertion that Pauley applied the word categorized as profane to the deputy. As previously noted, the testimony concerning whether this word was used by Magistrate Pauley was evenly divided. Additionally, the evidence concerning the number of times Pauley used this epithet was also conflicting, ranging from not at all to twenty-five times. To accept at face value this evidence concerning the repetitive nature of Magistrate Pauley's statement is to accept that Pauley perseverated antimatedly as if his record was stuck. Our inclination is that this testimony is incredible. Furthermore, as discussed earlier, one witness testified that Pauley's statement was not addressed to his bailiff, but was a general exclamation of frustration. It is difficult to imagine how Deputy Sheriff Crabtree could feel personally abused or insulted by such a general statement.

In its findings of fact, the Board states that "Magistrate Pauley attacked the competency of the bailiff ...." Apparently, this finding stems from testimony by Deputy Sheriff Crabtree that Pauley called him "ignorant," testimony which was uncorroborated by any of the other five witnesses. A review of the record leaves the distinct impression that Magistrate Pauley was indeed exasperated by his bailiff's refusal to comply with his order to secure the release of James Trent. It is easy to understand Magistrate Pauley's sense of frustration in dealing with his recalcitrant bailiff. In addition to the historical tension between Magistrate Pauley and members of the Sheriff's Department, the bailiff's obstinance reflected a fundamental misunderstanding of his role as attendant to Magistrate Pauley and his responsibility respecting prisoners.

West Virginia Code § 50–1–14 (1980), provides that,

> Subject to the supervision of the chief justice of the supreme court of appeals or of the judge of the circuit court, or the chief judge thereof if there is more than one judge of the circuit court, it shall be the duty of the sheriff, or his designated deputy, to serve as bailiff of a magistrate court upon the request of the magistrate. Such service shall also be subject to such administrative rules as may be promulgated by the supreme court of appeals. A writ of mandamus shall lie on behalf of a magistrate to enforce the provisions of this section.

As is stated in Rule VII of the Trial Court Rules for Courts of Record:

> The sheriff, or a deputy, shall be present at all times while the court is in session. The sheriff shall provide a sufficient number of deputies to maintain order in the courtroom at all times. The rules and orders of the court pertaining to conduct in the courtroom shall be enforced by him or them.[4]

4. In *Merrill v. Phelps*, 52 Ariz. 526, 529–30, 84 P.2d 74, 76 (1938), the Arizona Supreme Court

A "bailiff" has been defined as "[a] court officer or attendant who has charge of a court session in the matter of keeping order, custody of the jury, and custody of prisoners while in the court." Black's Law Dictionary 129 (1979). Similarly, in *Caldaro v. Ferber*, 74 N.J.Super. 128, 134–35, 180 A.2d 705, 708 (1962), *rev'd on other grounds*, 39 N.J. 314, 188 A.2d 576 (1963), the court stated, "Generally, court attendants are present for the purpose of preserving order in the court, taking charge of the jury, and other work incidental to the trial of cases." [5]

In performing these functions, it is essential that the bailiff understands his role as an officer of the court attendant to the judge or magistrate to whom he is assigned. The inherent power that courts possess to provide for necessary attendants in order to perform their constitutional duties has been recognized. For example, in *State ex rel. Moran v. Department of Administration*, 103 Wis.2d 311, 317, 307 N.W.2d 658, 662 (1981), the court stated, "A court has inherent power to appoint its own bailiff, despite legislation purporting to restrict appointment to a certain group of public employees selected by the sheriff." *See also Eshelman v. Commission-*

*ers of County of Berks*, 62 Pa.Commw. 310, 313, 436 A.2d 710, 712 (1981); *Stevenson v. Milwaukee County*, 140 Wis. 14, 18, 121 N.W. 654, 656 (1909). It has also been noted that, "The bailiff is an officer of the court. *Brickley v. State*, 286 Ala. 546, 243 So.2d 502 (1970)." *Fuller v. State*, 365 So.2d 1010, 1011 (Ala.Cr.App.1978). A bailiff is subject to the control and supervision of the court he serves. *See City of Cincinnati v. Flaherty*, 71 Ohio App. 539, 543, 50 N.E.2d 373, 375 (1943). This power of supervision of court personnel is critical to the independence of the judiciary. In *Gray v. Hakenjos*, 366 Mich. 588, 595, 115 N.W.2d 411, 414 (1962), the Michigan Supreme Court noted,

> The rule is well settled that under our form of government the constitution confers in the judicial department all the authority necessary to exercise its powers as a co-ordinate branch of government. It is only in such a manner that the independence of the judiciary can be preserved. The courts cannot be hampered or limited in the discharge of their functions by either of the other 2 branches of government. To remove bailiffs and other court personnel for cause is an inherent power of the judiciary.

traced the history of the sheriff's role as court attendant:

> Under the common law of England, the judges did not sit solely in certain particular territorial areas. Their jurisdiction extended to all parts of the country, and they held court part of the time at Westminster, and part of the time in such places as the business of the nation required. When they exercised the latter function, it was the custom from time immemorial that the sheriff of the county in which the court was to be held, who was the chief administrative officer of that county, met the judge as he entered the county and from that time on furnished him all attendants and other conveniences necessary to carry on the business of the court, obeying its orders in all respects as to what was done.

5. In *Merrill v. Phelps*, 52 Ariz. at 532, 84 P.2d at 77, the following duties of court attendants were deemed reasonably necessary for the proper functioning of a court:

> "(a) To direct the jurors to their places in the jury box while impanelling the jury;
> "(b) To maintain order and decorum in the court room at all times during the sessions of the court;

> "(c) To prevent the effacing and destruction of the furniture and fixtures in the court room;
> "(d) To see that such court room is properly lighted, ventilated and heated;
> "(e) To take charge of the jury when under the rule and after the case has been finally submitted, and to see that no one communicates with the jury during its deliberations;
> "(f) To wait upon the judge while upon the bench and to convey to the judge and to lawyers such law books as they may request;
> "(g) To keep the corridors clear when the court room is crowded and to keep order therein;
> "(h) To call witnesses into the court room and answer telephone calls at all times;
> "(i) To call attorneys and others whose attendance upon the court are required; and
> "(j) To do numerous other duties not hereinabove specifically mentioned and set out."

Therefore, the court held that "it is the duty of the sheriff, or his deputies, to perform [these services] when ordered by the court." *Id.*

A bailiff is an officer of the court to which he or she is assigned, subject to its control and supervision, and responsible for preserving order and decorum, taking charge of the jury, guarding prisoners, and other services which are reasonably necessary for the court's proper functioning. In the present action, the Judicial Hearing Board recognized Crabtree's inappropriate behavior in questioning a clear order of Magistrate Pauley to bring the prisoner before him.

In *Merrill v. Phelps*, 52 Ariz. at 537, 84 P.2d at 79 (1938), the Arizona Supreme Court held that although the primary power of providing suitable bailiffs in its superior courts rests with the sheriff, "if the court is of the reasonable opinion that the attendants so provided are not sufficient in number or suitable in character, it can demand that sufficient and suitable attendants be provided, and refuse to accept any that, in its opinion, do not satisfy these requirements." *See also State ex rel. Hillis v. Sullivan*, 48 Mont. 320, 329, 137 P. 392, 395 (1913). In reaching this conclusion, the *Merrill* court had occasion to discuss at length the relationship between a sheriff and a judge in the appointment of a court bailiff:

> [I]t may be said that to permit one public officer to appoint a deputy, who is nevertheless by law subject to the exclusive control of another officer, in so far as certain of his duties are concerned, is bound to give rise to such a conflict in authority and so much friction and bad feeling, that it will hamper the court in the performance of its duty. We think this is a non-sequitur. Public officers are all presumed to be servants of the public, working harmoniously together in the interest of their employer, and willing to lay aside their own personal feelings in the interest of the better transaction of public business.... We think that so long as the judge has the final decision as to whether the attendants chosen by the sheriff are sufficient in number and of such a character so that

the things which the court thinks are necessary for these attendants to do are done, the essential dignity of the court is protected and an orderly and proper transaction of business is assured.

56 Ariz. at 535–36, 84 P.2d at 78–79. It is obvious that in the present action the presumption that public servants will work harmoniously together for the common good was at best rebuttable, and that the actions of the sheriff and his deputy were an affront to the essential dignity of the court. In fact, on July 11, 1979, Sheriff Melton, in disregard of W.Va.Code § 50–1–14, asserted by letter, "as of this date I will not assign any deputy as a Night Court Bailiff while Magistrate Herbert Pauley is presiding."

▅ When a judicial officer lawfully orders a bailiff to deliver up an incarcerated person, it is the bailiff's duty to comply, unless restrained by a higher judicial authority.[6] The bailiff's crucial role in maintaining order in the courtroom requires his or her undivided loyalty and allegiance to the judge whom he or she serves. At the hearing before the Judicial Hearing Board, Deputy Sheriff Crabtree was questioned concerning his refusal to bring the prisoner before Magistrate Pauley:

Q Well, were you telling Mr. Pauley that he couldn't release the prisoner?

A I explained to Mr. Pauley that I could not get him out of the jail.

Q And that is when Mr. Pauley got upset, is that correct?

A That's when he blew up.

Q Okay. Now did you ever bring the prisoner over to be released?

A I don't think I did, no sir.

Q Even though Mr. Pauley had indicated to you that he wanted him brought over to be released, is that right?

A I was a deputy with about two years on the department. I had a corporal tell me that she could not release

---

6. For example, in Syllabus Point 1 of *State ex rel. Walker v. Giardina*, 170 W.Va. 483, 294 S.E.2d 900 (1982), this Court stated, "A party may not disobey a lawful order of an appellate court because he has been advised to do so by a lower court."

that individual from the jail because of the hold from Raleigh County.

Q  Well, but the fact of the matter is, he had ordered him to be released and you did not bring him over to be released?

A  No sir, I didn't.

It was inappropriate for the bailiff to question the authority of the magistrate to release the prisoner in question.

Counties are not authorized to "hold" prisoners for any length of time for other counties. West Virginia Code § 62–1–7 (1977), provides:

> If the warrant issued, or if the offense is alleged to have been committed, in a county other than the county of arrest, all papers in the proceeding shall be promptly transmitted to a justice of the county having jurisdiction of the offense for preliminary examination or trial. If the defendant is unable to provide bail in the county of arrest, he shall be committed to the custody of an officer who shall take him *without unnecessary delay* before a justice of the county wherein the examination or trial is to be held, there to be dealt with as provided by law. (emphasis added).

In the present case, arrangements were made for proper bail for the defendant. The need to take the prisoner to Raleigh County "without unnecessary delay" did not arise. Magistrate Pauley testified that notations to this effect appeared on the release form given to his bailiff by Pauley to take to the jail. Additionally, Magistrate Pauley told Crabtree over the telephone while Crabtree was at the jail that the Raleigh County matter had already been taken care of and that the prisoner was to be released. Yet, Deputy Sheriff Crabtree continued to protest that his hands were tied by the "hold" from Raleigh County.

█ The duty of Magistrate Pauley to have been patient, dignified, and courteous with his insubordinate bailiff is clear. Un-

questionably, judges may be appropriately disciplined for using abusive, insulting, intemperate, obscene, profane, threatening, vulgar, or other offensive language. *See, e.g., Aldrich v. State Commission on Judicial Conduct*, 58 N.Y.2d 279, 460 N.Y. S.2d 917, 447 N.E.2d 1276 (1983); *Roberts v. Commission on Judicial Performance*, 33 Cal.3d 739, 190 Cal.Rptr. 910, 661 P.2d 1064 (1983); *Gonzalez v. Commission on Judicial Performance*, 33 Cal.3d 359, 188 Cal.Rptr. 880, 657 P.2d 372 (1983); *Matter of Frankel*, 414 Mich. 1109, 323 N.W.2d 911 (1982); *In re Horan*, 85 N.J. 535, 428 A.2d 911 (1981); *Matter of Ross*, 428 A.2d 858 (Me.1981); *Shilling v. State Commission on Judicial Conduct*, 51 N.Y.2d 397, 434 N.Y.S.2d 909, 415 N.E.2d 900 (1980); *Matter of Seraphim*, 97 Wis.2d 485, 294 N.W.2d 485 (1980), *cert. denied*, 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291; *Matter of Albano*, 75 N.J. 509, 384 A.2d 144 (1978); *Matter of Bennett*, 403 Mich. 178, 267 N.W.2d 914 (1978); *Spruance v. Commission on Judicial Qualifications*, 13 Cal.3d 778, 119 Cal.Rptr. 841, 532 P.2d 1209 (1975); *Geiler v. Commission on Judicial Qualifications*, 10 Cal.3d 270, 110 Cal. Rptr. 201, 515 P.2d 1 (1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974); *In re Glickfeld*, 3 Cal.3d 891, 92 Cal.Rptr. 278, 479 P.2d 638 (1971). We must jealously guard, however, against the use of judicial disciplinary proceedings based upon a judge's purported language as a pretext for politically motivated attacks upon his or her character or integrity.[7] We must also caution judges not to allow political differences to affect their judicial performance, including observing proper decorum in the courtroom.

█ Under Rule III(C)(2) (1983 Supp.) of the West Virginia Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates, the allegations of a complaint in a judicial disciplinary proceeding "must be proved by clear and convincing evidence."[8] The "clear and

---

7. It should be noted that on January 7, 1981, after Sheriff Melton became Assessor of Kanawha County, he requested that his complaint against Pauley be dropped.

8. The Findings of Fact, Conclusions of Law, and Proposed Disposition by the Judicial Hearing Board are barren of reference to the standard of

convincing evidence" standard is, by far, the generally accepted rule throughout the country in judicial disciplinary proceedings. *See Matter of Martinez*, 99 N.M. 198, 656 P.2d 861, 866 (1982); *In re Anderson*, 412 So.2d 743, 747 (Miss.1982); *People ex rel. Judicial Inquiry Board v. Courts Commission*, 91 Ill.2d 130, 133, 61 Ill.Dec. 789, 790, 435 N.E.2d 486, 487 (1982); *Matter of Haddad*, 128 Ariz. 490, 492, 627 P.2d 221, 223 (1981); *In re Broome*, 245 Ga. 227, 227, 264 S.E.2d 656, 656 (1980); *Lavender v. Woodliff*, 605 P.2d 1338, 1338 (Okl.Jud.Ct. 1979); *In re Gillard*, 271 N.W.2d 785, 805 (Minn.1978); *Matter of Cieminski*, 270 N.W.2d 321, 326 (N.D.1978); *Nicholson v. Judicial Retirement and Removal Commission*, 573 S.W.2d 642, 644 (Ky.1978); *Matter of Field*, 281 Or. 623, 629, 576 P.2d 348, 351 (1978); *In re Johnson*, 568 P.2d 855, 866 (Wyo.1978); *Matter of Johnson*, 483 Pa. at 240, 395 A.2d at 1325; *In re Nowell*, 293 N.C. 235, 247, 237 S.E.2d 246, 254 (1977); *In re LaMotte*, 341 So.2d 513, 516 (Fla.1977); *Matter of Samford*, 352 So.2d 1126, 1129 (Ala.1977); *Matter of Heuermann*, 90 S.D. 312, 317, 240 N.W.2d 603, 606 (1976); *In re Rome*, 218 Kan. 198, 206, 542 P.2d 676, 684 (1975); *In re Hanson*, 532 P.2d 303, 307–08 (Alaska 1975); *Geiler v. Commission on Judicial Qualifications*, 10 Cal.3d at 275, 110 Cal.Rptr. at 204, 515 P.2d at 4 (1973); *In re Diener*, 268 Md. 659, 670, 304 A.2d 587, 594 (1973); *In re Haggerty*, 257 La. 1, 31, 241 So.2d 469, 479 (1920); *Contra, Matter of Hardt*, 72 N.J. 160, 167–69, 369 A.2d 5, 9 (1977) (beyond a reasonable doubt); *Matter of Duncan*, 541 S.W.2d 564, 569 (Mo.1976) (preponderance of the evidence); *In re Terry*, 262 Ind. 667, 670–71 n. 2, 323 N.E.2d 192, 194 n. 2 (1975), *reh. denied*, 262 Ind. 667, 329 N.E.2d 38, *cert. denied*, 423 U.S. 867, 96 S.Ct. 129, 46 L.Ed.2d 97 (preponderance of the evidence); *In re Brown*, 512 S.W.2d 317, 320 (Tex.1974) (preponderance of the evidence), *but see In re Laughlin*, 153 Tex. 183, 190, 265 S.W.2d 805, 809 (Tex.1954) (clear and convincing evidence).

The policies underlying this standard of proof are several. First, as the Kansas Supreme Court stated in *In re Rome*, 218 Kan. at 206, 542 P.2d at 684: "In so grave a matter as depriving a judge of his office or subjecting him to some form of discipline the burden of proof should be no less [than clear and convincing evidence]." *See also In re Diener*, 268 Md. at 670, 304 A.2d at 594 ("the severity of the impact ... upon the individual compels the application of the clear and convincing test"); *In re Laughlin*, 153 Tex. at 190, 265 S.W.2d at 809. Second, "clear and convincing evidence" is often required in analogous attorney disciplinary proceedings. In *In re LaMotte*, 341 So.2d at 516, the Florida Supreme Court utilized this approach in holding, "The degree of proof required to discipline a judge is analogous to that required in disciplining an attorney. This degree of proof must be 'clear and convincing.'" *See also Matter of Field*, 281 Or. at 679, 576 P.2d at 351. Finally, the unique purpose and function of judicial disciplinary proceedings has also been cited as a reason for requiring clear and convincing evidence. In *Matter of Cieminski*, 270 N.W.2d at 326, the North Dakota Supreme Court noted,

> Disciplinary proceedings are neither civil nor criminal. Their aim is to maintain the honor and dignity of the judiciary and the proper administration of justice. The very nature and function of the judiciary can make it the target of dissidents. Case law has established that the proper standard of proof is by "clear and convincing evidence."

*See also Matter of Heuermann*, 90 S.D. at 317, 240 N.W.2d at 606; *In re Hanson*, 532 P.2d at 307–08.

■ If the allegations contained in the complaint against Magistrate Pauley were proven by clear and convincing evidence, this Court would concur with the Board's recommendation of public censure. As demonstrated by our review of the evidence, the case against Magistrate Pauley falls short of the standard of proof required under our law for judicial discipline.

Accordingly, the Court holds that allegations contained in the complaint against

proof applied in reviewing the evidence present-   ed in this case.

Magistrate Pauley were not proven by "clear and convincing evidence," and therefore the complaint must be dismissed.

It is so ordered.

MILLER, Justice, dissenting:

The majority correctly cites Canon 3(A)(3) of the Judicial Code of Ethics as requiring a judge to "be patient, dignified and courteous."[1] It also correctly states that a number of courts have held that abusive and offensive language on the part of a judge in the course of his official duties will constitute a violation of the canon.[2]

The majority then proceeds to stand the evidence on its head by concluding that "[t]he testimony before the Board was evenly divided at best and ambiguous at worst." (Maj.Op., p. 231) Three witnesses, Norma Bennett, Jack Dolin, and Deputy Crabtree, heard Magistrate Pauley state "this shit will stop" with reference to the procedures utilized by the sheriff's department.

A fourth witness, Yvonne Dolin, a bondswoman, contrary to the assertion of the majority, did not say the statement was not made but stated that she had not heard it. She testified that she was not in the courtroom at all times as she had gone to the jail in order to arrange a bail bond. Not unexpectedly, Magistrate Pauley and his secretary, Nadine Withrow, testified that the phrase was not used.

I find it incredible that the majority would characterize this evidence as close. Even more incredible is the attempt to resort to dictionary sophistry to demonstrate that the word "shit" means "nonsense" or "foolishness." (Maj.Op., pp. 231–232)[3]

Furthermore, independent of the profanity issue, the record clearly reveals abusive conduct toward Deputy Crabtree which even the majority opinion cannot mask. The purpose of the canon is to give recognition to the fact that judges are the personal embodiment of the judicial process and should be able to avoid quarreling with and abusing those who appear before them. To hold otherwise not only demeans the office, but casts a cloud over the impartiality and effectiveness of the administration of justice.

Finally, I do not believe that the fact the person abused in this case was a deputy sheriff somehow exculpates the magistrate. I have no quarrel with the general proposition, advanced by the majority, that a court bailiff is subject to the control and supervision of the court to which he is assigned. However, I find nothing in the law that would indicate a bailiff is not protected by Canon 3. I would affirm the

1. Canon 3(A)(3) of the Judicial Code of Ethics provides: "A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control."

2. *Aldrich v. State Commission on Judicial Conduct,* 58 N.Y.2d 279, 460 N.Y.S.2d 915, 447 N.E.2d 1276 (1983); *Roberts v. Commission on Judicial Performance,* 33 Cal.3d 739, 190 Cal. Rptr. 910, 661 P.2d 1064 (1983); *Gonzalez v. Commission on Judicial Performance,* 33 Cal.3d 359, 188 Cal.Rptr. 880, 657 P.2d 372 (1983); *Matter of Frankel,* 414 Mich. 1109, 323 N.W.2d 911 (1982); *In Re Horan,* 85 N.J. 535, 428 A.2d 911 (1981); *Matter of Ross,* 428 A.2d 858 (Me. 1981); *Shilling v. State Commission on Judicial Conduct,* 51 N.Y.2d 397, 434 N.Y.S.2d 909, 415 N.E.2d 900 (1980); *Matter of Seraphim,* 97 Wis.2d 485, 294 N.W.2d 485 (1980), *cert. denied,* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291;

*Matter of Albano,* 75 N.J. 509, 384 A.2d 144 (1978); *Matter of Bennett,* 403 Mich. 178, 267 N.W.2d 914 (1978); *Spruance v. Commission on Judicial Qualifications,* 13 Cal.3d 778, 119 Cal. Rptr. 841, 532 P.2d 1209 (1975); *Geiler v. Commission on Judicial Qualifications,* 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1 (1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974); *In Re Glickfeld,* 3 Cal.3d 891, 92 Cal.Rptr. 278, 479 P.2d 638 (1971). Other jurisdictions not cited by the majority are: *In Re Crowell,* 379 So.2d 107 (Fla.1979); *In Re Broome,* 245 Ga. 227, 264 S.E.2d 656 (1980); *In Re Dwyer,* 223 Kan. 72, 572 P.2d 898 (1977); *In Re McDonough,* 296 N.W.2d 648 (Minn.1979).

3. The majority's conclusion that "[t]he mischaracterization of the word in question [by the Hearing Board] undermines the conclusions of fact and law with which we are presented, as well as the ultimate recommendation of discipline" may be a fitting epitaph for its own opinion.

public reprimand recommended by the Hearing Board.