318 S.E.2d 418
**In re Kermit W. PAULEY.**

**No. 15–81.**

Supreme Court of Appeals of
West Virginia.

March 21, 1984.
Dissenting Opinion July 25, 1984.

Charles R. Garten, Charleston, for appellant, W.Va. Judicial Investigation Commission.

Jack O. Friedman, Charleston, for appellee, Kermit Pauley.

MILLER, Justice:

This is a judicial disciplinary proceeding. The Judicial Hearing Board has recommended that we suspend Kermit W. Pauley, the respondent magistrate, for a period of six months as authorized by Rule III(C)(13)(a) of the Rules of Procedure for the Handling of Complaints Against Justices, Judges, and Magistrates (hereinafter Disciplinary Rules). After an independent examination of the record, we adopt the disposition recommended by the Board.

The Board found that Pauley failed to comply with the provisions of W.Va.Code, 62–1–5 & 6, and thereby violated Canons 1, 2(A), 3(A)(1), and 3(A)(4) of the Judicial Code of Ethics.[1] At the outset, we address Pauley's argument that the Judicial Hearing Board should not have considered the Pauley case in view of an earlier recommendation made by the former Judicial Review Board.

By order of December 15, 1982, this Court made certain changes to the Disciplinary Rules.[2] The name of the Judicial Review Board was changed to the Judicial Hearing Board (hereinafter Board).[3] To ensure that pending cases would be properly completed, the order directed that all records, reports, and findings were to be transferred to the new Board.

When the new Board met and reviewed the Pauley case on February 10, 1983, it noted that no findings of fact or conclusions of law had ever been made in the case, as required by our Disciplinary Rules. *See* Rule II(B)(15) (1976) and Rule III(C)(13) (1982).[4] The Board concluded that it now had that responsibility.

---

1. These canons are:

 CANON 1: "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective."

 CANON 2(A): "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

 CANON 3(A)(1): "A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism."

 CANON 3(A)(4): "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the sub-

stance of the advice, and affords the parties reasonable opportunity to respond."

2. Most of the changes to the Disciplinary Rules were procedural in an attempt to clarify and expedite the hearing procedures.

3. The relevant part of the order stated:

 "The Judicial Hearing Board will exist as of 12:01 a.m. December 16, 1982. At that time the Judicial Review Board, created by a rule promulgated October 1, 1976 shall cease to exist. The Chairman of the Judicial Review Board shall provide to the Chairman of the Judicial Hearing Board all of its records, reports, and findings, and a description of all business of the Judicial Review Board."

4. Rule III(C)(13) (1982) provides as pertinent here:

 "At the conclusion of the hearing and upon consideration of all the substantial, probative, and reliable evidence developed and upon the arguments presented, the Board shall make and enter on the record of the proceedings its written recommendation, which shall contain findings of fact, conclusions of law, and proposed disposition."

 The former Judicial Review Board had considered the case and by a letter dated October

██ We think the Board was correct in its action as findings of fact and conclusions of law are required so that we can have some understanding of the basis for its decision. *See Tasker v. Mohn,* 165 W.Va. 55, 267 S.E.2d 183, 190 (1980); *In re Brown,* 164 W.Va. 234, 262 S.E.2d 444, 446 (1980); *Mountain Trucking Co. v. Public Service Commission,* 158 W.Va. 958, 963, 216 S.E.2d 566, 569 (1975). We also note that the Board's decision is not conclusive since this Court must make "an independent evaluation of the record and recommendations of the Judicial Review Board [now Judicial Hearing Board] in disciplinary proceedings." Syllabus Point 1, in part, *W.Va. Judicial Inquiry Commission v. Dostert,* 165 W.Va. 233, 271 S.E.2d 427 (1980). Consequently, we find that Magistrate Pauley has suffered no substantial prejudice.

Turning to the merits of the case, the proceedings against Pauley arose out of his conduct when a person was arrested and initially brought before him. The relevant facts are that on March 17, 1981, Alfred Jackson, who later committed suicide in the Kanawha County Jail, was brought before Pauley by a state trooper at about 8:30 a.m. The trooper stated that he had arrested Jackson without a warrant for an attempted burglary. Upon bringing Jackson before the magistrate, the trooper then prepared an affidavit or complaint for an arrest warrant. Pauley decided that an arrest warrant should issue, but because no clerical assistance had arrived that morning the warrant was not typed until later that day. Pauley committed Jackson to jail before the warrant was typed.

The Board found that the arrest warrant was not completed at the time that the defendant was committed to the jail and that this violated W.Va.Code, 62–1–5, which provides in relevant part that "[w]hen a person arrested without a warrant is brought before a justice [magistrate], a complaint shall be filed and a warrant issued forthwith."[5] We have previously indicated that this provision requires in the case of a warrantless arrest that "the person arrested must be taken before a magistrate without delay, and a complaint must be filed and a warrant issued immediately." *West Virginia Judicial Inquiry Commission v. Casto,* 163 W.Va. 661, 664, 263 S.E.2d 79, 81 (1979).

In *Casto,* the magistrate had a defendant before him on traffic violations based upon traffic citations issued by deputy sheriffs. The defendant paid a fine and costs and a few days later appeared and requested an appeal. In the process of preparing the appeal, the magistrate discovered that no arrest warrants had been issued and he then prepared them. However, the complaints for the warrants were not signed by the deputies until several months later and were dated back to the day that the defendant had paid the fine and costs.

It was this action that gave rise to a formal complaint against the magistrate. We declined to find a violation, since we concluded that the magistrate had not prejudiced the rights of the defendant, but was attempting to effect his appeal. We did characterize the magistrate's procedure as error.

██ Here, a more egregious violation has occurred as the magistrate was not assisting the defendant when he failed to take the initial step of preparing the warrant. It would have been no great task for the magistrate to have written out the warrant. In *Casto,* we pointed out that "criminal actions in magistrate courts are instituted by the issuance of a warrant. W.Va. Code, 50–4–2." 163 W.Va. at 664, 263 S.E.2d at 81. It is from the warrant that the defendant is apprised of the nature of the offense with which he is charged.

22, 1982, without findings of fact and conclusions of law, had recommended that no sanctions be imposed. The Chief Justice had written to the Judicial Review Board returning the letter and requesting that appropriate findings be made. This had not been done prior to the time the new Board came into being.

**5.** Similarly, Rule 5(a) of the West Virginia Rules of Criminal Procedure, effective October 1, 1981, provides, in relevant part: "If a person arrested without a warrant is brought before a magistrate, a complaint shall be filed forthwith which shall comply with the requirements of Rule 4(a) with respect to the showing of probable cause."

The Board also found that Pauley did not follow the requirements of W.Va.Code, 62–1–6,[6] in that he did not inform Jackson in plain terms of the nature of the complaint against him; of his right to counsel; of his right to remain silent, or of his right to a preliminary hearing. Furthermore, no effort was made to obtain an affidavit of indigency and Pauley did not provide Jackson with a reasonable means to communicate with an attorney or with at least one relative or other person for the purpose of obtaining counsel or arranging bail.

Pauley contends, however, that the evidence shows that when Jackson was brought before him he was uncooperative and refused to listen to his rights. The arresting officer testified that when Pauley tried to advise Jackson of his rights utilizing the standard rights form, Jackson said the police did not have anything on him and that he knew his rights and was not signing anything. The trooper said that Pauley did not continue to go through the rights form line by line and did not attempt to get Jackson's signature.

Pauley testified that when Jackson was brought before him, he was upset about having been handcuffed too tightly. Pauley stated that the defendant would not talk to him or give him any address. He testified that he always advised defendants of their rights, but did not do so in this case because of Jackson's statements and uncooperative demeanor.

Although Magistrate Pauley was confronted with an individual who may have been uncooperative, we do not believe that this can excuse his failure to follow the procedures prescribed by W.Va.Code, 62–1–6. After the magistrate has explained the defendant's rights and the defendant has refused to sign the form, then the magistrate should indicate on the form that the defendant refused to sign it, but had been advised of his rights. Moreover, the magistrate should ensure that counsel will be appointed by marking the appropriate box. Our system is designed to expect more than a perfunctory effort in explaining the initial mandatory rights form.[7]

W.Va.Code, 62–1–6, is couched in mandatory language and imposes a legal duty on magistrates to comply with its requirements as we discussed in *State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261 (1981). *See also State v. Mason*, 162 W.Va. 297, 249 S.E.2d 793 (1978).

Magistrates by virtue of their legal duties play an extremely important initial role in the criminal justice system in this State. Magistrates must make every effort to advise citizens of their rights and to ensure that no person is unnecessarily incarcerated in jail. In this case, Magistrate Pauley committed Jackson to jail without completing the proper intake papers, resulting in a failure to afford him counsel and a prompt disposition of the charge.

Other courts have held that the deliberate failure to follow mandatory criminal

---

6. W.Va.Code, 62–1–6, provides:

"The justice [magistrate] shall in plain terms inform the defendant of the nature of the complaint against him, of his right to counsel and, if the offense is to be presented for indictment, of his right to have preliminary examination. He shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him. He shall provide the defendant reasonable means to communicate with an attorney or with at least one relative or other person for the purpose of obtaining counsel or arranging bail. The defendant shall not be committed to jail or removed from the county of arrest until he has had a reasonable opportunity to confer with counsel or to arrange bail. He may be detained under such security measures as the

circumstances warrant. If the defendant is unable to provide bail or if the offense is unbailable, he shall be committed to jail." These same provisions are embodied in Rule 5(c) of the Rules of Criminal Procedure.

7. The magistrate's manual clearly spells this out:

"Great care must be taken in these explanations particularly when the accused arrives at the initial appearance without an attorney. While it is assumed that an accused who is represented by an attorney will be protected by his attorney, the magistrate must still proceed cautiously. It will be unusual to have an attorney present at the initial appearance, so almost in all cases the magistrate must follow the steps to advise the accused of his rights." S. Shinaberry, Bench Book for West Virginia Magistrates 27 (1979 rev. ed.).

procedures constitutes a violation of the Judicial Code of Ethics, *Matter of MacDowell*, 57 A.D.2d 169, 393 N.Y.S.2d 748 (1977); *Matter of Cieminski*, 270 N.W.2d 321 (N.D.1978), or mandatory hearing and reporting procedures, *Matter of Ross*, 428 A.2d 858 (Me.1981); *Matter of Holder*, 74 N.J. 581, 379 A.2d 220 (1977); *Matter of Hardt*, 72 N.J. 160, 369 A.2d 5 (1977); *Matter of Guay*, 101 Wis.2d 171, 303 N.W.2d 669 (1981).

 We hold that the Board's finding that the Judicial Code of Ethics has been violated is supported by clear and convincing evidence as required by Rule III(C)(2) of the Disciplinary Rules. *See* Syllabus Point 4, *In re: Herbert L. Pauley*, 173 W.Va. 228, 314 S.E.2d 391 (1983). We, therefore, adopt the Board's recommendation that Magistrate Pauley be suspended for six months without pay.

Complaint Sustained.

NEELY, Justice, dissenting:

I respectfully dissent to the majority opinion in this case on the grounds that Magistrate Pauley has been made the scapegoat for an egregious, systemic institutional failure. The death of Mr. Alfred Jackson while incarcerated in the Kanawha County Jail is a tragedy; however, the proximate cause of that tragedy was not any culpable behavior on the part of Magistrate Pauley. Although Magistrate Pauley's office is hardly a model of judicial competence, the drastic sanction of suspension that this Court has imposed on the Magistrate is more related to the system's embarassment that a defendant killed himself while in our custody than it is to any action taken by the Magistrate.

I

The majority opinion adopts the sanction recommended by the Judicial Hearing Board. This recommendation, in turn, is based solely on the earlier record of the 3 May 1982 hearing concerning Magistrate Pauley after Mr. Jackson hanged himself. The now defunct Judicial Review Board that conducted the hearing proposed, in a letter of 22 October 1982, that no formal action be taken against Magistrate Pauley. Apparently this Court was dissatisfied with that recommendation because it returned the case to the Review Board (which subsequently became the Hearing Board as part of a general reorganization) with directions to make more specific findings. The unmistakeable signal was that the Board had reached the wrong conclusion. The Judicial Hearing Board then reinterpreted the same transcript by which the Judicial Review Board exonerated Magistrate Pauley and heard no new testimony or argument of counsel. On this basis the majority renders an opinion that affirms the Hearing Board!

My point concerning the scapegoating of Magistrate Pauley is probably well demonstrated by the fact that the majority opinion deals very briefly with the facts of the case. In fact, it is uncontroverted that when Mr. Jackson was brought before Magistrate Pauley he was at least mildly uncooperative, and abusive. Mr. Jackson was in jail without a lawyer to help him not because Magistrate Pauley failed to speak the magic litany, but rather because of incompetent handling of the paperwork. Mr. Jackson was brought to Magistrate Pauley at a satellite office early in the morning before the magistrate's secretary arrived and Mr. Jackson was committed from there directly to the Kanawha County Jail. Appropriate forms were not completed to effect the appointment of counsel and Mr. Jackson was in jail without outside assistance.

Although the record before the Judicial Hearing Board indicates incompetent performance, nothing demonstrates corrupt or improper motives, nor *deliberate* refusal to follow the administrative directives of either the Circuit Court of Kanawha County or this Court. All that is shown is simple negligence and it requires a feat of imagination to find that this negligence was the proximate cause of Mr. Jackson's death.

II

All bureaucracies dislike receiving bad news. Inevitably bureaucracies find the

generation of on-the-ground intelligence disconcerting because it discloses problems that then imply additional work. Accordingly, bureaucracies tend to measure performance by statistical criteria that disclose but one or two dimensions of the total operation—as for example, in the judiciary, the number of cases disposed of or the hours courts are open for business. When, however, a tragedy occurs as a result of factors that the bureaucracy refuses to measure—exactly because they imply systemic failure—the easy and time-honored way to propitiate all sins is to find a low-level employee scapegoat, cast the blame on him, impose a sanction, and proceed with business as usual. It is the bureaucratic equivalent to general confession in church and I believe that this is what has occurred in Magistrate Pauley's case.

The death of Mr. Jackson should forcefully point out to us that our system for handling difficult or obstreperous defendants is not what it should be; furthermore, it should point out to us that the management of our magistrate courts needs to be substantially improved. In the death of Mr. Jackson there are numerous places where the blame can be placed to far better effect than upon the magistrate in this case. If, indeed, Magistrate Pauley is not a paradigm of competence in the judging business, much of the blame should be placed at the feet of the Legislature. The ballot for election of magistrates in Kanawha County provides a "vote for ten," at-large race, which means that the electorate cannot focus upon defeating poor magistrates or reelecting good ones. Thus, as a result of legislative inattention to a problem that requires no money to cure, the elective process for magistrates in Kanawha County continues to be a joke. All that is required in a race where ten persons will be nominated from a potential field of fifty or elected from a field of twenty is a militant, provincial consistency. Such an absurd system allocates all its rewards to those elected magistrates willing to play the most vicious and provincial politics.

The Kanawha County political climate, providing as it does that circuit judges all run at large in a field of seven, does not encourage strong leadership (since leadership implies making enemies). At the time this incident occurred the Chief Judge of the Circuit Court of Kanawha County had not staffed the nonjudicial offices in the system with strong personnel and had not consistently set high standards, demanded appropriately high performance, and applied sanctions such as complaints to the Judicial Inquiry Commission when those standards were not met. Finally, and in my opinion most egregiously, this Court in 1976 designed a system for magistrate courts that did not work and could not work.

The current magistrate system needs a complete redesign employing the research done in the last ten years by major foundations (as for example the Ford Foundation through the National Center for State Courts) on proper systems of conflict resolution in small claim courts on the civil side and preliminary proceedings courts on the criminal side. This Court, being a multi-member body, has been paralyzed by a lack of consensus that has prevented the type of leadership that we should have given. Some delegation of responsibility for magistrate court affairs should have been given to a person or persons capable of concerted action.

As a court we have not:

(1) Inspected magistrate courts critically and on a formalized basis with our own members, rather than junior personnel;

(2) Provided the level of intensive training necessary to convert lay, elected personnel into competent judges;

(3) Insisted on first-class administration by local chief judges; and,

(4) Taken into receivership incompetent magistrate courts like Kanawha County's where the political process makes strong local leadership impossible, and operated them for as long as necessary to establish proper procedures.

When an organization fails to work and a tragedy results, it is the fault of the commanders and not the junior officers, unless some moral turpitude on the part of junior officers can be shown. Making Magistrate

Pauley a scapegoat is not only an injustice to him, but it gives the illusion that his punishment absolves the entire system in some symbolic way. In fact the system is not absolved and it is currently constructed as to guarantee new tragedies in the future.