339 S.E.2d 697

**In the Matter of Magistrate Kenneth L. GORBY.**

**No. 10–84.**

Supreme Court of Appeals of West Virginia.

Submitted April 30, 1985.

Decided July 9, 1985.

Rehearing Denied Oct. 9, 1985.

Charles R. Garten, Charleston, for Judicial Investigation Comn.

David J. Romano, Young, Morgan, Cann & Romano, Clarksburg, for Kenneth L. Gorby.

McGRAW, Justice:

This judicial disciplinary proceeding arises from a complaint filed with the Judicial Hearing Board by the Judicial Investigation Commission charging Magistrate Kenneth L. Gorby with violation of Canon 2A of the Judicial Code of Ethics. Following a hearing on the merits, the Hearing Board recommended that the complaint be dismissed. Independent review of the record presented, however, compels both a rejection of this recommendation and a determination that a serious ethical violation occurred warranting Magistrate Gorby's suspension without pay for a period of six months.

This proceeding was precipitated by a series of altercations initiated at a high school football game in Clarksburg on October 6, 1983. With arch rival Clarksburg Notre Dame leading previously unbeaten Clarksburg Roosevelt-Wilson by six points with less than three and a half minutes remaining on a turning clock, Magistrate Gorby, an ardent Roosevelt-Wilson supporter, was anxiously pacing the sidelines with Roosevelt-Wilson first-and-ten at their own forty yard line. On first down, a furious Notre Dame rush sacked the Roosevelt-Wilson quarterback on his own thirty. On second down, another Notre Dame blitz swarmed the Roosevelt-Wilson signal caller under with another loss. Magistrate Gorby testified that, "[T]ime was running out, this was going to be the last time we've got the ball and I didn't like it. I said to myself, damn, or something like this and ... I thought this is important, the Notre Dame band across the way was really playing to where you couldn't hardly hear yourself...."

Magistrate Gorby shouted at Harry Bailey, assistant band director at Roosevelt-Wilson, "I don't understand this, how come our band isn't playing like the Notre Dame band is playing[?]" Bailey further testified that Magistrate Gorby angrily demanded, "[W]hy wasn't the band doing something to

help the team win, why hadn't they been showing more spirit throughout the game, why hadn't they been playing[?]" Magistrate Gorby testified that Bailey responded, "It doesn't make any difference anyway." Bailey testified that he responded, "What could the band do to help a football team win a game[?]" In any event, their conversation became increasingly heated.

Bailey testified that Magistrate Gorby used foul and abusive language; that when he started to walk away, Magistrate Gorby grabbed him by the arm and started pushing him behind the band toward the end zone; that he broke free from Magistrate Gorby's grasp and headed to where the school principal was seated in the stands; that Magistrate Gorby followed him, cornered him near the bleachers, and landed a right to his forehead, knocking his hat to the ground. Bailey testified that several men then restrained Magistrate Gorby by pinning him against the bleachers.

Magistrate Gorby testified, on the other hand, that no foul or abusive language was directed at Bailey and that he did not make physical contact with Bailey. Magistrate Gorby did admit, however, that following his verbal altercation with Bailey, he followed Bailey over to area of the stands where the principal was seated. He stated that he did this, not to continue his argument with Bailey, but to tell his side of the argument that had just occurred to the principal. Magistrate Gorby testified that, "I told him that the problem with our athletic program up there is we have too many people like him [Bailey], that's not interested in the overall program, the overall team, the only ones interested in the football team is the players and coaches themselves." Magistrate Gorby denied striking Bailey.

At this point, Mrs. Sue Lucante, whose daughter was a majorette for Roosevelt-Wilson entered the scuffle. While seated in the stands with another daughter, Marci Lucante Elli, Mrs. Lucante testified that:

[W]e looked back toward the band and I always do to see where my daughter is and I saw some men fighting, so, I ran back because I thought my daughter was

in danger, she weighs 90 pounds and she's the smallest one on the majorette squad and they're all dressed alike, so you don't know and when I went back I seen this little girl bent down to pick up the hat. Mr. Bailey had been hit in the face, as I was going toward him, I could see this man hit him in the face and knock his hat off.

Mrs. Lucante testified that she ran up to Magistrate Gorby, who grabbed her and threw her to one side, stating, "Get the hell out of my way." She further testified that when her daughter, Marci, came to her aid, Magistrate Gorby backhanded her daughter in the mouth, lacerating her lip on her new braces. She testified that her daughter said, "Look what you've done to my mouth ... I'm telling my dad." Magistrate Gorby asked, "Who the hell is your dad?" "Jim Lucante," Marci responded. Magistrate Gorby then retorted, "You tell Jim Lucante to go screw himself."

With the exceptions of initiation of contact and the striking of Marci Lucante Elli, Magistrate Gorby's version of the Lucante confrontation was substantially the same as Mrs. Lucante's. He stated that as he was talking with Bailey and the principal, "[T]his woman grabbed me by the face ... she had me right here and pushed my head back against the bleachers and I couldn't believe it." He admitted grabbing her arm and pulling it away from his face. He testified that, "I don't remember saying, get the hell out of the way, but if I did, it wouldn't surprise me at all." He stated that Marci Lucante Elli then came up and took a swing at him, but that another individual stepped between them before he made any contact. Finally, with respect to the comment concerning Marci's father, Magistrate Gorby admitted that, "[I]t wouldn't surprise me a bit if I said it exactly like that."

Although other witnesses testified concerning the two altercations, their testimony was rather inconclusive. Rodney Losh, who was some distance away, and who admitted that, "I wasn't paying that much attention," testified that, "I just happened to look over ... [a]nd there was a lady

from the bleachers came down onto the track and grabbed his beard and his face and I seen him throw his hands up ... and there was a younger girl with this lady and two gentlemen stepped in between them and Mr. Gorby." One of these gentlemen, Lawrence Shaughnessy, testified that he jumped between Magistrate Gorby and Marci Lucante Elli as Marci started swinging her purse at Gorby; that Gorby never struck Marci; and, that Marci's bloodied lip either resulted from striking his shoulder as he stepped between them or by striking herself in the mouth with her purse as she swung it at Magistrate Gorby.

After Magistrate Gorby went home, his brother called to inform him that complaints were being filed against him in magistrate court. Magistrate Gorby, along with his son, a medical student, went directly to the sheriff's department where Gorby "asked the jailer there on duty to check my hands because they said a girl had been smacked in the mouth ... and remember my appearance ... because they said I was over there drunk." The two Gorbys then went to the magistrates' office, where another skirmish with Harry Bailey ensued.

Bailey testified that as he approached the magistrates' office, he noticed Magistrate Gorby and his son standing in the doorway. He stated that he stood in the parking lot waiting to see in which direction they were going. As Magistrate Gorby and his son began approaching, however, Bailey continued walking toward the building, when Magistrate Gorby pinned him against a car using his body. After Bailey forced his way past him he stated that Gorby's son grabbed him and began hitting him in the stomach. Bailey testified that he then broke free, backed away, and began yelling for the police.

Donald Davis, a Clarksburg city policeman, who was in the magistrates' office, testified that, "I believe that what Mr. Bailey said was, 'Help, police, help,' or 'Help, please, help,' .... I was the first one out the door, at the time I went out, Mr. Bailey was backing toward the building ... Magistrate Gorby was in front of him facing

him but not actually touching him." Davis then stepped between the two men, and Bailey went inside the building to file a complaint.

Magistrate Gorby testified that Bailey, a much smaller man, went out of his way to confront Gorby. Although he admitted that he bumped Bailey, he stated that Bailey bumped him first. With respect to his son's activities, Gorby conceded that, "[H]e grabbed Bailey ... but again at the same time Bailey's jerking with him, too, I mean, it's like one of those things that nobody got slugged."

A total of three misdemeanor warrants were issued against Magistrate Gorby as a result of his escapades. Although, as of the date of the Judicial Hearing Board proceedings, none of the three had come to trial.

■ In reaching its recommendation of dismissal, the Judicial Hearing Board relied primarily upon Syllabus Point 4 of *In re Pauley*, 173 W.Va. 228, 314 S.E.2d 391 (1984), which provides, "Under Rule III(C)(2) (1984 Supp.) of the West Virginia Rules of Procedure for the Handling of Complaints Against Justices, Judges and Magistrates, the allegations of a complaint in a judicial disciplinary proceeding 'must be proved by clear and convincing evidence.'" *See also* Syl. pt. 2, *Matter of Harshbarger*, 173 W.Va. 206, 314 S.E.2d 79 (1984). Our responsibility, however, with respect to that recommendation is clear. As we held in Syllabus Point 1 of *West Virginia Judicial Inquiry Commission v. Dostert*, 165 W.Va. 233, 271 S.E.2d 427 (1980), "The Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings." *See also* Syl. pt. 1, *In re Markle*, 174 W.Va. 550, 328 S.E.2d 157 (1984); Syl. pt. 1, *In re Pauley*, 173 W.Va. 475, 318 S.E.2d 418 (1984); Syl. pt. 1, *Matter of Harshbarger, supra;* Syl. pt. 1, *In re Pauley*, 173 W.Va. 228, 314 S.E.2d 391; Syl. pt. 1, *Judicial Inquiry Commission v. McGraw*, 171 W.Va. 441, 299 S.E.2d 872 (1983). That independent evaluation compels our conclusion that although not all

the allegations in the complaint against Magistrate Gorby were proved by clear and convincing evidence, sufficient evidence was presented to clearly and convincingly demonstrate personal misconduct warranting imposition of appropriate discipline.

As previously noted, Magistrate Gorby was charged with a violation of Canon 2A of the Judicial Code of Ethics, which provides that, "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The commentary to this canon further illuminates this ethical consideration:

> Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

Accordingly, as the court noted in Syllabus Point 7 of *Matter of Bennett*, 403 Mich. 178, 267 N.W.2d 914 (1978), "[A] judge, whether on or off the bench, is bound to strive toward creating and preserving the image of the justice system as an independent, impartial source of reasoned actions and decisions. Achievement of this goal demands that a judge, in a sense, behave as though he is always on the bench." Similarly, in *In re Haggerty*, 257 La. 1, 29, 241 So.2d 469, 478 (1970), *quoting, Stanley v. Jones*, 201 La. 549, 562–63, 9 So.2d 678, 683 (1942), the court stated:

> "The office of judge is one in which the general public has a deep and vital interest, and, because that is true, the official conduct of judges, as well as their private conduct, is closely observed. When a judge, either in his official capacity or as a private citizen, is guilty of such conduct as to cause others to question his character and morals, the people not only lose respect for him as a man but lose respect for the court over which he presides as well."

A survey of decisions throughout the country reveals a number of cases in which private misconduct has been held to warrant judicial discipline. In *In re Haggerty*, 257 La. at 42, 241 So.2d at 478, a judge was removed from office for his open, notorious, and continuous participation in illegal gambling activities; for his organization of and participation in a "stag" party, including his procurement of pornographic photographs and films for purposes of display and exhibition and of three women for purposes of prostitution and the performance of indecent acts; and, for his flight and resistance of arrest when the "stag" party was raided by local police. In *In Re Inquiry of Lee*, 336 So.2d 1175, 1177 (Fla. 1976), a judge was reprimanded and suspended from exercising jurisdiction in criminal matters indefinitely as the result of an incident in which he was discovered openly engaging in sexual acts while in an automobile parked in a public parking lot. In *Matter of Carrillo*, 542 S.W.2d 105, 112 (Tex.1976), a judge was removed from office for his participation in a welfare fraud scheme; for his misappropriation of public funds in connection with a false invoice scheme; and, for his utilization of public employees and equipment for his own private benefit. Finally, in *In re Conduct of Roth*, 293 Or. 179, 189, 645 P.2d 1064, 1070 (1982), a judge was censured for striking an automobile occupied by his estranged wife and another gentleman who was injured by flying window glass, and for then slapping his estranged wife who was uninjured.

On at least two occasions, isolated instances of nonjudicial misconduct substantially similar to the facts presented in the instant proceeding have been held to warrant removal from office. In *Kuehnel v. State Commission on Judicial Conduct*, 49 N.Y.2d 465, 468, 403 N.E.2d 167, 167–68, 426 N.Y.S.2d 461, 462 (1980), the court described the incident justifying removal:

> As petitioner was leaving a tavern on the evening of May 5, 1978, he detained four youths whom he suspected of breaking glass in an adjacent parking lot. When the questioning did not proceed to his satisfaction, petitioner ordered the juveniles into a nearby grocery store for the purpose of calling the police. As he ush-

ered the youths into the store, petitioner struck one of them, age 13, in the back of the head causing the latter to fall forward with such force that his head struck a bulletin board or doorframe. Although petitioner denied the blow, the credible evidence indicates otherwise. ... At the station house, petitioner's conduct was even less restrained. Upon entering the station, petitioner proceeded to upbraid the youths in a most injudicious manner. His language was vulgar and derogatory, his manner taunting and hostile. He uttered particularly demeaning comments concerning an identifiable ethnic group and stated that if he ever saw one of the youths before his court, he would send her to jail. While leaving, petitioner, presumably irritated by the attitude of the four youths, was prompted to vent his displeasure by intentionally, and without any justifiable provocation, striking one of them, age 16, in the face, causing his nose to bleed. Following this assault, petitioner left the police station without apology.

In *Matter of Cerbone*, 61 N.Y.2d 93, 95, 460 N.E.2d 217, 218, 472 N.Y.S.2d 76, 77 (1984), the court described a similar incident warranting removal from office:

In the early evening of October 25, 1981, petitioner entered a Mount Kisco tavern for a meeting with the business's owner, who was one of petitioner's legal clients. While he was in the bar, petitioner had a confrontation with some of the other patrons, primarily several black men. A heated exchange occurred, during which petitioner admittedly used abusive and profane language. Petitioner loudly proclaimed that he was a judge and announced what he would do if any of the black patrons appeared before him in court. The evidence, which includes testimony by a number of witnesses, establishes that petitioner embellished his threatening remarks with racial epithets. The record also shows that petitioner either struck or pushed one of the other customers. This incident did not end until after the police twice came to the tavern and, on the second occasion, petitioner left with his brother.

Although the circumstances in the instant proceeding, with the exceptions of the flaunting of judicial authority and the use of racially derogatory language, bear a striking resemblance to those presented in the preceding cases warranting imposition of the most severe penalty available, the evidence submitted in the instant proceeding appears to be slightly more conflicting. Certain aspects of the events of the evening in question, however, are clearly supported by the evidence presented. First, a rather heated verbal altercation did occur between Magistrate Gorby and band director Bailey. Although Magistrate Gorby denied using foul and abusive language during this altercation, his admitted pursuit of Bailey to explain his side of the argument to the principal undermines his rather sedate description of his initial discussion with Bailey. Second, Bailey's testimony concerning the blow which resulted in his hat being knocked to the ground was strongly corroborated by Mrs. Lucante, who testified that her mistaken impression that her daughter was near the fray picking up Bailey's hat precipitated her arrival on the scene. Third, Magistrate Gorby's testimony that Mrs. Lucante pounced upon him without warning was directly contradicted by all the other witnesses who uniformly testified that words were exchanged between the two before admitted contact was made. Fourth, Magistrate Gorby as much as admitted stating to Mrs. Lucante, "Get the hell out of my way," and responding to Mrs. Lucante's daughter, "You tell Jim Lucante to go screw himself." Fifth, Magistrate Gorby's trip to the sheriff's department to verify his sobriety and the condition of his hands belittles his testimony that, at the time, he considered the prior incidents a "joke." Sixth, Officer Davis' testimony concerning the scene outside the magistrates' office directly contradicts Magistrate Gorby's assertion that Bailey was the aggressor. Additionally, it is difficult to believe that Bailey, a much smaller man by Magistrate Gorby's own testimony, would go out of his way to confront Magistrate Gorby, especially when accompanied by his grown son. Fi-

nally, although Magistrate Gorby denied it, several witnesses testified that he appeared to be intoxicated.

■ From the clear and convincing weight of the evidence presented, we conclude that Magistrate Gorby failed to "conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary" in violation of Canon 2A of the Judicial Code of Ethics. We further find that Magistrate Gorby's injudicious demeanor and behavior warrants his suspension for six months without pay commencing from the date of the filing of this opinion.

Six Month Suspension Without Pay.