IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2020 Term

_____

No. 19-0032
_____

**FILED**
**April 22, 2020**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN THE MATTER OF:

THE HONORABLE DAVID E. FERGUSON,
MAGISTRATE OF WAYNE COUNTY

_____

JUDICIAL DISCIPLINARY PROCEEDING
No. 35-2018

NINETY-DAY SUSPENSION WITHOUT PAY
AND OTHER SANCTIONS

_____

Submitted: January 14, 2020
Filed: April 22, 2020

Teresa A. Tarr, Esq.
Brian J. Lanham, Esq.
Judicial Disciplinary Counsel
Charleston, West Virginia
Attorneys for West Virginia Judicial
Investigation Commission

R. Lee Booten II, Esq.
Huntington, West Virginia
Attorney for Respondent Ferguson

JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS**

1. "The Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings." Syl. Pt. 1, *W.Va. Judicial Inquiry Comm'n v. Dostert*, 165 W.Va. 233, 271 S.E.2d 427 (1980).

2. "'''Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding 'must be proved by clear and convincing evidence.'" Syllabus Point 4, *In Re Pauley*, 173 W.Va. 228, 235, 314 S.E.2d 391, 399 (1983).' Syllabus Point 1, *Matter of Hey*, 192 W.Va. 221, 452 S.E.2d 24 (1994)." Syl. Pt. 1, *In re Starcher*, 202 W.Va. 55, 501 S.E.2d 772 (1998).

3. "The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl., *Matter of Gorby*, 176 W.Va. 16, 339 S.E.2d 702 (1985).

4. "Always mindful of the primary consideration of protecting the honor, integrity, dignity, and efficiency of the judiciary and the justice system, this Court, in determining whether to suspend a judicial officer with or without pay, should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the

i

administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist." Syl. Pt. 3, *In re Cruickshanks*, 220 W.Va. 513, 648 S.E.2d 19 (2007).

**HUTCHISON, Justice:**

This matter arises from a judicial disciplinary Statement of Charges issued against the respondent, David E. Ferguson, Magistrate of Wayne County (hereinafter "the respondent"). The issues in the case surround the respondent's violation of a state fishing law and, far more importantly, the belligerent and coercive behavior that he exhibited when Department of Natural Resources ("DNR") officers issued him a citation. After holding an evidentiary hearing, the West Virginia Judicial Hearing Board (hereinafter "the Board") concluded that the respondent violated several provisions of the West Virginia Code of Judicial Conduct and recommended that he be suspended for thirty days without pay, be issued a reprimand, pay a total fine of $2,000, and pay the costs of this disciplinary proceeding. Although he denied several of the charges when appearing before the Board, the respondent now indicates his willingness to accept the Board's findings and the recommended punishment. The Office of Judicial Disciplinary Counsel ("JDC") objects to some of the Board's findings and the recommended sanction.

After considering the record and the parties' written and oral arguments, we adopt the Board's conclusions of law regarding the respondent's rule violations with one modification. Specifically, we conclude that the respondent committed an additional violation of Rule 1.1 of the Code of Judicial Conduct. Furthermore, because of the respondent's flagrant attempt to intimidate law enforcement officers, we find that a harsher sanction than that recommended by the Board is warranted. Therefore, we suspend the

1

respondent for ninety days without pay, reprimand him, order him to pay a total fine of $2,000, and order him to pay the costs of this disciplinary proceeding.

## I. Facts and Procedural Background

The respondent became a magistrate in Wayne County on or about November 1, 2016, and continues to hold that position. In April 2018, a DNR official filed a judicial ethics complaint against the respondent describing events that occurred when two DNR officers issued the respondent a citation. After an investigation, the Judicial Investigation Commission issued a Formal Statement of Charges alleging that the respondent violated multiple provisions of the Code of Judicial Conduct. The Board held an evidentiary hearing to address the Statement of Charges on June 24 and 25, 2019. The following evidence was presented at the hearing.

On February 21, 2017, the respondent went fishing with his father[1] at the East Lynn Lake spillway. Many people were fishing at the spillway because the DNR had stocked it with trout earlier that day. Also present were two undercover DNR officers, Corporal Larry Harvey and Officer Jacob Miller, who were watching for any violation of state fishing laws. At the time, the respondent did not know these DNR officers, and the officers did not know him.

---

[1] The respondent's father is also named David Ferguson. To avoid confusion, we will refer to the respondent's father simply as "father" in this opinion. The father is a retired magistrate.

Corporal Harvey testified that he was standing on the bank at a vantage point where he could observe the respondent, the respondent's father, and a third man[2] fishing for trout and conversing with one another. Pursuant to state regulation, the daily creel limit was six trout per person. *See* W.Va. C.S.R. § 58-60-5.2 (2017). Corporal Harvey explained that although the respondent had already caught six trout, the respondent then caught two additional fish and gave one to his father and one to the third man. Officer Miller testified that after being alerted to the situation by Corporal Harvey, he also witnessed the respondent catch extra fish. Corporal Harvey testified that as the men were packing up to leave, he saw that the respondent had six fish for himself that he carried on a stick, the respondent's father had six fish on a stringer, and the third man had six fish on a stringer. The officers determined that the respondent's actions were contrary to state regulation, so Corporal Harvey instructed Officer Miller to intercede and write a citation.

While Corporal Harvey remained on the bank of the spillway, Officer Miller followed the respondent up a hill to a parking lot. When they reached the respondent's vehicle, Officer Miller identified himself as a DNR officer and displayed his DNR badge and identification card, saying this is "just to show you, I'm not lying about who I am." The officer requested the respondent's photo identification, fishing license, and trout stamp. Officer Miller testified that the respondent dropped the tailgate of his truck, threw a card down on the tailgate in an "arrogant manner," and said "well, I'm not lying about

---

[2] The DNR officers did not learn the identity of the third man.

3

who I am, either." The officer testified that the card the respondent threw down was a West Virginia Supreme Court photo identification card. According to Officer Miller, the impression that the respondent gave during this exchange was that he "was telling me he was somebody, some type of . . . whether it be attorney, judge, magistrate, [I] didn't know at the time. That he's somebody above the law. That it wouldn't apply to him. That I – I couldn't enforce the law." Upon the officer's second request, the respondent produced his driver's license, fishing license, and trout stamp.

The respondent's father and, at some point in time, the third man walked from the spillway up to the parking lot.[3] A few minutes later, Corporal Harvey joined them and sent Officer Miller to issue citations to other people who were fishing illegally. Corporal Harvey testified that he instructed the respondent, the respondent's father, and the third man to stay where they were while he went to a nearby picnic table to gather his paperwork. Before he left, Corporal Harvey saw that there were three creels each holding six fish in the back of the respondent's truck. However, the corporal recalls that when he returned from the picnic table, the third man had left and there were only two creels with five fish each in the truck. Corporal Harvey asked "what happened to your friend," and the respondent answered "what friend." When Corporal Harvey explained that he was asking

---

[3] There is conflicting testimony as to whether the respondent's father and the third man walked to the parking lot together, or whether the third man arrived a few minutes later.

4

about the man that they had been fishing with, the respondent said "I don't know what you're talking about."

Corporal Harvey testified that "things [were] starting to get a little bit out of hand." The corporal described how, while pointing to the fish in the truck bed, the respondent raised his voice and demanded that the corporal "prove that . . . I've exceeded the limit of trout. I want you to look in the back of this truck right here. There's two stringers there, and there's five fish on each stringer. Now you tell me – prove to me, how that [sic] I've exceeded the limit." According to the corporal, the respondent twice said, "you go ahead and do what you're gonna do. This ain't going nowhere." Meanwhile, the respondent's father was also becoming agitated.

Corporal Harvey recounted how he returned to the picnic table to write the citations and to put some distance between himself and the agitated men. The respondent put his hands in his pockets and started walking toward the corporal. During his testimony, the corporal explained that being approached by someone who has his hands in his pockets is a "huge officer safety issue" inasmuch as there could be a weapon in the person's pocket. Corporal Harvey testified that he directed the respondent to remove his hands from his pockets, saying something to the effect of, "I don't want to get shot today." According to the corporal, this "enraged" the respondent. While pacing back and forth the respondent angrily said to his father, "so now I'm gonna shoot . . . I guess I'm gonna shoot him." The

5

respondent's father then demanded that they be allowed to leave. In his testimony, the corporal described how the men's bad behavior continued to escalate:

> [They were] pacing back and forth, side to side, screaming at the top of the lungs. If they really wanted me to understand a point they had to say, they'd take a couple steps toward me, and they'd put their head over their chest right here, and then scream it real loud, like this (demonstrating) . . . . [T]he Respondent's father, if I'm remembering, is the one that really talked to me about the law, and the [sic] he – he said that, you know, "I know the law. You can't be arrested. This is not a jailable offense. You can't be arrested for this." And that goes on a minute. And the Respondent would – would come back and – and he would justify it. He would say again what the father said. "Yeah, you can't arrest us for this. This is not – this is not a jailable offense." And like I said, most of the whole time, is screaming, it's throwing their hands up in the air like this, and just unbelievable to me, to be truthful with you.

The corporal explained that the men finally calmed down and he was able to issue each of them a citation for violating the state fishing law. Corporal Harvey testified that as he handed the citation to the respondent, the respondent named two of the corporal's supervisors at the DNR and indicated that he would be contacting them.

Corporal Harvey testified that while it usually takes him just five minutes to write and issue a citation, this encounter with the respondent and his father lasted between thirty and forty-five minutes because of the men's behavior. He summed up the encounter by noting that "[i]n my 19 years of experience, I have wrote [sic] many fish citations, exceeding the limit citations. I've never had anything close to this happen, not – I mean, this was terrible over a fishing violation." During the exchange, the respondent's father

6

mentioned that he was a former magistrate, but the officers did not learn until later that the respondent was a sitting magistrate.

The citation issued to respondent included two misdemeanor charges: exceeding the creel limit and illegal possession of wildlife. Another Wayne County Magistrate, Billy Runyon, testified that the respondent pled no contest to exceeding the creel limit and paid a small fine and court costs. Upon the motion of the county prosecuting attorney, the other charge was dismissed.

During the Board hearing, the respondent, by counsel, argued that his fishing violation was *de minimus* and that the DNR officers lied about what had occurred.[4] In his testimony, the respondent admitted that he knew the creel limit was six trout, that he caught and killed seven trout that day, and that he knew his actions violated the fish and game law. He admitted that he gave one of the fish to his father, but denied catching any additional trout or giving fish to anyone else. He explained that on the very same day the citation was issued, he went to the courthouse and pled no contest to the charge of exceeding the creel limit. The respondent explained that he has since identified the "third man" referenced by the DNR as Mr. Lendisy Napier, a long-time acquaintance of his father who happened to sit on the other side of his father while fishing at the spillway that day. The respondent

---

[4] The respondent's counsel argued that DNR officials were biased against the respondent because they were unhappy about the respondent's judicial rulings in other matters.

7

explained that they had not "gone fishing" with Mr. Napier, and at the time, he had not even known Mr. Napier's name. According to the respondent, the bank of the spillway was crowded with people and he regularly talks to everybody when he goes fishing.

During the Board's hearing, both the respondent's father and Mr. Napier testified and corroborated the respondent's testimony that they had not arrived together and had not "gone fishing" together. Mr. Napier testified that he left the bank of the spillway several minutes after the respondent and the respondent's father, and when he reached the parking lot, the DNR officers did not ask him to stay or even speak to him. Mr. Napier also denied that the respondent gave him any fish. Mr. Napier testified that he caught all six fish in his possession, and he only left with the six fish he caught.

With regard to his Supreme Court photo identification card, the respondent testified that he accidentally took it out of his wallet while retrieving his driver's and fishing licenses. He denied that he was attempting to intimidate the officer with this card or his magistrate position.

The respondent also disputed the allegations that he acted in a belligerent manner while receiving the citation. With regard to Corporal Harvey, the respondent testified that "I'm not going to say at the very end, that I didn't – that I didn't raise my voice a little bit, but I was never out of hand with Mr. Harvey." According to the respondent, he had just two fingers in his pockets when the corporal said, "[g]et your hands

out of your pockets. I don't want f***ing shot today." The respondent testified that this statement "frustrated" him because he would never harm a law enforcement officer, but he nonetheless apologized to the corporal. After further questioning during the Board's evidentiary hearing, the respondent admitted that he "might've spoken angrily after" the statement about getting "f***ing shot," but he denied ever waving his arms or acting belligerently. The respondent explained that his father was "pretty irate," and "for the most part," the respondent was trying to calm his father down. The respondent's father testified and admitted that he swore at Corporal Harvey, and that he even demanded to be arrested, but that the respondent did not behave in this manner. Both the respondent and his father indicated that it was Corporal Harvey who was disrespectful.

Finally, the respondent admitted that he used the names of two DNR supervisors while receiving the citation, and he acknowledged that it was wrong to have done so. He emphasized that he did not follow through with contacting the supervisors, and instead, he pled no contest and paid the ticket that same day.

After hearing all of the evidence, the Board concluded that the JDC proved the following violations of the Code of Judicial Conduct by clear and convincing evidence:

**Rule 1.1:** Rule 1.1 requires a judge[5] to comply with the law.[6] The Board concluded that the respondent violated this rule by violating a state fishing regulation.

**Rule 1.2:** Rule 1.2 requires a judge to act in a manner that promotes public confidence in the judiciary and that avoids impropriety or the appearance of impropriety.[7] The Board concluded that the respondent violated this rule by engaging in inappropriate and disrespectful conduct during the DNR's officers' investigation and issuance of citations. Although the respondent denied that he had acted inappropriately, and denied that he presented his Supreme Court photo identification card, the Board found that the officers' testimony on these events was credible and that the respondent's testimony was not credible. The Board also found that the respondent violated this rule when, during a sworn statement given to the JDC as part of the ethics investigation, he denied that he had acted in a disrespectful and coercive manner toward the DNR officers. Finally, the Board concluded that the respondent also violated this rule by breaking the state fishing law. The Board observed that "[a]lthough violating fishing laws may seem minor in the greater scheme of things, even minor violations by judges can erode public confidence in the judiciary[.]"

---

[5] For purposes of the Code of Judicial Conduct, the word "judge" encompasses magistrates. *See* W.Va. Code Judic. Conduct, Application I(A).

[6] Rule 1.1 provides: "A judge shall comply with the law, including the West Virginia Code of Judicial Conduct."

[7] Rule 1.2 provides: "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

**Rule 1.3:** Rule 1.3 forbids a judge from abusing the prestige of a judicial office.[8] The Board concluded that the respondent violated this rule by displaying his Supreme Court identification card to allude to his judicial status and imply that he should receive different and favorable treatment because of his judicial position.

**Rule 2.16(A):** Rule 2.16(a) requires a judge to be candid and honest with disciplinary authorities.[9] The Board concluded that the respondent violated this rule during his sworn statement to the JDC by improperly denying that he had acted in a disrespectful and coercive manner toward the DNR officers. The Board observed that the respondent's actions in being "less than candid" with the JDC undermined the public's confidence in his commitment to the high ethical standards expected of judicial officers.

**Rules 3.1(C) and (D):** Rule 3.1 prohibits a judge from, *inter alia*, engaging in extrajudicial activities that would undermine a judge's credibility or would appear to be coercive.[10] The Board concluded that the respondent violated these rules by violating the

---

[8] Rule 1.3 provides: "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so."

[9] Rule 2.16(A) provides: "A judge shall cooperate and be candid and honest with judicial and lawyer disciplinary agencies."

[10] Rule 3.1 provides, in part:

> A judge may engage in extrajudicial activities, except as prohibited by law or this Code. However, when engaging in extrajudicial activities, a judge shall not:
> . . .
> (C) participate in activities that would appear to a reasonable person to undermine the judge's independence, integrity, or impartiality; [or]

11

fishing law, acting in an intemperate manner toward the officers, and acting coercively toward the officers.

The Board also found that the JDC failed to prove some of the claims asserted in the Statement of Charges. The respondent was charged with violating the Code of Judicial Conduct by denying that he had been fishing with a third man. The Board found the JDC did not prove these allegations because the respondent credibly testified that he did not know Mr. Napier by name at the time and that they had not been fishing together. Furthermore, although the respondent violated a different rule by making misstatements during his sworn statement to the JDC, the Board rejected the allegation that these misstatements also violated Rule 1.1. As set forth above, Rule 1.1 prohibits a judicial officer from violating the law,[11] and the Board found insufficient evidence that any misstatement during the sworn statement constituted a violation of any law.[12]

---

(D) engage in conduct that would appear to a reasonable person to be coercive . . . .

[11] *See supra* n. 6.

[12] The Board also found that other claims in the Statement of Charges were not proven by clear and convincing evidence. Because the JDC does not challenge those findings in its brief to this Court, we will address them in only cursory fashion. The Statement of Charges alleged that the respondent was trying to "tip off" people to the presence of the undercover DNR officers. Before he knew who Officer Miller was, the respondent reportedly walked by Officer Miller and commented "you guys need to look out. There are some game wardens, some new game wardens here." Officer Miller laughed off the comment, and the respondent continued moving along the bank to a spot where he fished. The Board found that instead of being made with the intention of interfering with the undercover officers' work, the respondent's statement could have been intended to encourage compliance with the fishing laws. In addition, the Statement of Charges alleged

12

For the respondent's multiple violations of the Code of Judicial Conduct, the Board recommended that this Court suspend the respondent for thirty days without pay, reprimand him, order him to pay a total fine of $2,000, and order him to pay the costs of this disciplinary proceeding. The JDC objected to some of the Board's findings and to the recommended sanction, and the Court heard oral argument on the matter. The case is now ready for a decision.

## II. Standard of Review

It is well-established that "[t]he Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings." Syl. Pt. 1, *W.Va. Judicial Inquiry Comm'n v. Dostert*, 165 W.Va. 233, 271 S.E.2d 427 (1980). "Included within this independent evaluation is the right to accept or reject the disciplinary sanction recommended by the Board." *In re Crislip*, 182 W.Va. 637, 638, 391 S.E.2d 84, 85 (1990). Moreover, pursuant to Rule 4.5 of the Rules of Judicial Disciplinary Procedure, in order for the Court to take disciplinary action, the JDC must prove the allegations in the Statement of Charges by clear and convincing evidence. Syl. Pt. 1, *In re Starcher*, 202 W.Va. 55, 501 S.E.2d 772 (1998). Finally, we are guided by the principle that "[t]he purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and

---

that the respondent made misrepresentations during his sworn statement to the JDC about the substance of a conversation he had with Magistrate Runyon. However, the Board found that Magistrate Runyon's testimony at the evidentiary hearing did not support this claim. Having reviewed the record, we agree with the Board's findings on these two matters.

13

efficiency of the members of the judiciary and the system of justice." Syl., *In re Gorby*, 176 W.Va. 16, 339 S.E.2d 702 (1985). With these standards in mind, we consider the parties' arguments regarding both the violations of the Code of Judicial Conduct and the appropriate sanction to impose.

## III.  Discussion

### A. Violations of the Code of Judicial Conduct

In their briefs submitted to the Court, the JDC and the respondent agree with many of the Board's findings of fact and conclusions of law—including that the respondent violated Rules 1.1, 1.2, 1.3, 2.16(a), and 3.1(C) and (D) of the Code of Judicial Conduct in the manner set forth above. Having reviewed the record, we agree that those violations were proven by clear and convincing evidence.

However, the JDC contends that the Board erroneously rejected some other allegations in the Statement of Charges. The JDC asserts that the Board should have found that the respondent lied to Corporal Harvey when the corporal asked "what happened to your friend" who was fishing with you, and the respondent denied knowing what the officer was talking about. The JDC asserts that the Board also should have found that the respondent lied about these things during his sworn statement. The JDC argues that the DNR officers' testimony was credible and consistent, but both the respondent and his father lied during the evidentiary hearing, so it was error to make a credibility finding in the respondent's favor on this issue. As such, the JDC asks the Court to make findings of fact

14

that Mr. Napier was fishing with the respondent, that the respondent knew Mr. Napier's name at the time, that the respondent intentionally refused to identify Mr. Napier when questioned by Corporal Harvey, and that the respondent lied about this matter during his sworn statement.

After reviewing the record, we agree with the Board that the JDC failed to present clear and convincing evidence that the respondent lied about Mr. Napier. It could have easily appeared to the officers, who were observing from a distance, that the three men were fishing together on the crowded bank of the spillway. Thus, we do not find fault with the DNR officers' testimony. However, the respondent testified that while Mr. Napier happened to be a friend of his father, the respondent did not know him or his name at the time, and they had not been fishing together. Importantly, Mr. Napier corroborated the respondent's testimony. Moreover, the fact that the DNR officers never learned Mr. Napier's name or obtained his driver's and fishing licenses supports Mr. Napier's recitation of the events; Mr. Napier testified that he walked to the parking lot several minutes after the respondent and the father and never spoke to or interacted with the DNR officers. Even though we make an independent review of the record in judicial disciplinary cases, on this issue we will defer to the Board's credibility determinations and resolution of conflicting evidence.[13] *See e.g., Sims v. Miller*, 227 W.Va. 395, 402, 709 S.E.2d 750, 757 (2011) ("the

_____

[13] It is possible that the respondent's father, who had known Mr. Napier for several years, made a misrepresentation to Corporal Harvey about Mr. Napier. However, the respondent is not responsible for his father's conduct.

15

hearing examiner who observed the witness testimony is in the best position to make credibility judgments."); *Dale v. Veltri*, 230 W.Va. 598, 604, 741 S.E.2d 823, 829 (2013) (noting that "[t]he hearing examiner was in a position to observe the demeanor of the witness, noted the obvious difference between the allegations . . . , and resolved the conflict" in the evidence).

Next, the JDC contends that the Board erroneously rejected one of the claims in the Statement of Charges that accused the respondent of violating Rule 1.1 of the Code of Judicial Conduct. Rule 1.1 mandates that a judicial officer shall "comply with the law, *including the West Virginia Code of Judicial Conduct.*"[14] (emphasis added.) The Board found that the respondent violated Rule 1.1 by breaking the fishing law, but the Statement of Charges asserted that he also violated Rule 1.1 by lying during his sworn statement to the JDC. As set forth above, the Board concluded that the respondent violated Rule 2.16(A) by falsely denying in his sworn statement that he had behaved in a disrespectful and coercive manner toward the DNR officers. The JDC argues that because the Board found that the respondent violated Rule 2.16(A), logic dictates that he also violated the provision of Rule 1.1 that prohibits a judicial officer from violating the Code of Judicial Conduct. We agree with the JDC on this issue.

---

[14] *See supra* n. 6.

The Board rejected the JDC's arguments about this Rule 1.1 infraction by finding that there was insufficient evidence that any misstatement during the sworn statement constituted a violation of any law. However, the Board's reading of Rule 1.1 is too narrow. Not only does the Rule require judicial officers to comply with statutory and regulatory law, it also requires them to comply with the Code of Judicial Conduct. Accordingly, we conclude that by providing false information to the JDC during his sworn statement, the respondent also violated Rule 1.1.

**B. Sanction**

Having concluded that the respondent violated several provisions of the Code of Judicial Conduct, we turn to the question of what sanction to impose. Pursuant to Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure, the permissible sanctions that may be imposed upon a judicial officer are admonishment, reprimand, censure, suspension without pay for up to one year, a fine of up to $5,000, and forced retirement in certain circumstances. *See* Syl. Pt. 6, *In re Watkins*, 233 W.Va. 170, 757 S.E.2d 594 (2013) (listing sanctions available in Rule 4.12). The Court may impose multiple sanctions for separate and distinct violations. *See* Syl. Pt. 5, *In re Toler*, 218 W.Va. 653, 625 S.E.2d 731 (2005). When deciding what sanction is appropriate in a particular case, our consideration is guided by the following factors:

> Always mindful of the primary consideration of protecting the honor, integrity, dignity, and efficiency of the judiciary and the justice system, this Court, in determining whether to suspend a judicial officer with or without pay, should consider various factors, including, but not limited to,

17

> (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

Syl. Pt. 3, *In re Cruickshanks*, 220 W.Va. 513, 648 S.E.2d 19 (2007).

When addressing the *Cruickshanks* factors in its recommended decision, the Board focused on the fact that the respondent entered a *nolo* plea to the violation of a state fishing regulation. By limiting its focus to the illegal fishing, the Board found that the respondent's actions were not related to the administration of justice, were entirely personal in nature, and did not involve violence or callous disregard for our system of justice. However, these findings ignore the most serious aspects of the respondent's misconduct.

This case is about much more than catching extra fish. Certainly, we want judicial officers to obey all laws, including state fishing regulations. However, if the respondent had behaved in a professional manner when receiving the fishing citation, this matter never would have resulted in a formal disciplinary proceeding. Instead, the respondent acted in a completely inappropriate, belligerent, and coercive manner toward the DNR officers while they were engaged in law enforcement activities. He threw down his Supreme Court photo identification card in an obvious attempt to obtain special treatment based upon his status as a judicial officer. He loudly asserted that the charges

18

"ain't going nowhere."[15] He became enraged when Corporal Harvey directed him to remove his hands from his pockets. He angrily paced, waved his arms, screamed, and argued with Corporal Harvey about the citation. He suggested that he would contact the officers' supervisors. All of this was in an effort to intimidate these officers into not doing their jobs. Finally, he lied to the JDC during his sworn statement when he denied acting in this disrespectful and coercive manner. Such behavior by a judicial official is wholly unacceptable, especially when it occurs in the context of a law enforcement matter. We conclude that the respondent's actions were directly related to the administration of justice and demonstrated a selfish and callous disregard for our system of justice. *See id.* The respondent's behavior when receiving the citation and lying to the JDC cast a pallor on the "honor, integrity, dignity, and efficiency of the judiciary and the justice system[.]" *See id*. Magistrates "may be 'appropriately disciplined for using abusive, insulting, intemperate, obscene, profane, threatening, vulgar, or other offensive language.' *In re Pauley*, 173 W.Va. 228, 235, 314 S.E.2d 391, 398 (1983)." *Watkins*, 233 W.Va. at 183, 757 S.E.2d at 607.

The fifth *Cruickshanks* factor directs the Court to consider any aggravating or mitigating factors on the issue of sanction. The Board found three aggravating factors. The Board noted the discrepancy between the respondent's admitted knowledge that he

---

[15] It has not escaped the Court's notice that the citation was returnable to the very court where the respondent serves as a magistrate. This fact undoubtedly emboldened him to make the statement that the citation would not go forward.

19

was violating the fishing regulations, and the fact that he denied committing any violations to the DNR officers. The Board also found that the incident would not have escalated if the respondent had simply accepted his citation "with the grace expected of a judicial officer." Finally, the Board found that the respondent "exacerbated the hostilities" by displaying his Supreme Court identification card and otherwise intimating that because of his status as a judicial officer, he should or would receive more favorable treatment. We agree that these are facts to consider when deciding the appropriate sanction. Indeed, the respondent's actions in displaying his Supreme Court photo identification, and in behaving in a belligerent manner when receiving the citation, are more than mere aggravating factors on the issue of sanction. As the Board correctly found, these actions constituted some of the behavior that violated the judicial canons.

The Board found four mitigating factors. The respondent had only been a magistrate for a few months before the incident occurred. The respondent's father, who was even more confrontational and disrespectful, may have influenced the respondent's poor behavior. There had been prior cases prosecuted by certain DNR officers in which the respondent and his father (a former magistrate) had made rulings with which those officers did not agree. Also, the respondent did not consult with an attorney with respect to the preparation of his written response to the ethics complaint or the giving of his sworn statement. However, the JDC objects and argues that there are only two mitigating factors present in this case: the respondent's inexperience as a magistrate at the time of the incident

20

at the spillway, and the fact that he has not received any prior judicial discipline. We agree with the JDC regarding the mitigating factors.

The fact that the respondent's father may have been acting in an even more belligerent manner does not excuse the respondent, a sitting magistrate, from complying with the judicial canons. Moreover, with or without counsel, a magistrate should certainly know to be truthful when testifying under oath. Finally, we reject the notion that other cases decided by the respondent or his father would have any bearing on our decision regarding the sanction in this matter. Although the respondent's counsel argued during the hearing that other cases were a motivating factor in the DNR's decision to file the underlying ethics complaint,[16] neither Corporal Harvey nor Officer Miller testified to any involvement in those other cases. Most importantly, there is nothing about those other cases that would justify the respondent's belligerent and coercive treatment of the officers when they were issuing this citation.

Having rejected many of the Board's findings regarding the *Cruickshanks* factors, we also reject the Board's recommendation of a one-month suspension. The Board's recommendation is simply too lenient for a judicial officer who attempted to

---

[16] The senior DNR official who filed the underlying ethics complaint, Captain Terry Ballard, referred to the respondent's actions in other cases that he considered to be unethical, but the Judicial Investigations Commission did not find probable cause to charge the respondent with violations in those matters.

intimidate and coerce law enforcement officers into not doing their jobs—even though the underlying matter was something minor like a fishing violation.

The JDC urges us to impose a fifteen-month suspension without pay, a censure instead of a reprimand,[17] plus the fine and costs recommended by the Board. However, this recommendation is based upon the JDC's argument that the respondent repeatedly lied about multiple issues in this case. That argument is not entirely supported by the Board's findings of fact or our independent review of the record. As set forth above, we concur with the Board's finding that the respondent lied in his sworn statement when denying that he behaved in a disrespectful and coercive manner, but the remaining claims of providing false information were not supported by clear and convincing evidence. While we disapprove of the respondent's actions, the sanction recommended by the JDC is too severe.

The Court has recognized that "[m]atters of suspension due to accusations of judicial misconduct are reviewed and decided based on the unique facts and circumstances of each case." *In re Fouty*, 229 W.Va. 256, 260, 728 S.E.2d 140, 144 (2012) (citation omitted). After carefully reviewing the unique facts and circumstances of this case, we

---

[17] Rule 4.12 of the Rules of Judicial Disciplinary Procedure defines a "reprimand" as a "severe reproof to a judge[,]" while a "censure constitutes formal condemnation of a judge[.]" *See id.*

conclude that a ninety-day suspension without pay, along with the other sanctions recommended by the Board, is the appropriate outcome.

## IV. Conclusion

For the foregoing reasons, the Court orders the following:

1. The respondent is suspended from his position as a Magistrate of Wayne County for a period of ninety days, without pay;

2. the respondent is reprimanded;

3. the respondent is ordered to pay a fine of $2,000; and

4. the respondent is ordered to pay the costs of this disciplinary proceeding.


Ninety-day suspension without pay and other sanctions ordered.